**Wendy COLBY, Plaintiff,**

v.

**HOLOGIC, INC., Joel Weinstein, David Ellenbogen, Jay Stein and Glenn Muir, Defendants.**

**Civ. A. No. 90–12822–Y.**

United States District Court, D. Massachusetts.

March 30, 1993.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, MA, for plaintiff.

James W. Stoll, M. Frederick Pritzker, Brown, Rudnick, Freed, & Gesmer, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This case presents the grimly familiar picture of disappointed investors crying fraud after fortunes were lost when a promising corporation stumbled in the winds of New England's lingering economic winter.

Here, the plaintiff, Wendy Colby ("Colby"), represents a purported class of persons who purchased stock in the defendant company, Hologic, Inc. ("Hologic"), between July 31, 1990, and November 16, 1990 ("the class period"), shortly before the company's stock crashed.

Count I of Colby's Amended Complaint [1] ("Am. Compl.") charges Hologic and four of

---

1. The Amended Complaint, filed January 10, 1991, succeeds an earlier Complaint, filed November 19, 1990. The original Complaint included a third count charging Hologic and the officers with fraudulent misrepresentations in Hologic's Registration Statement filed with the Securities and Exchange Commission. These misrepresentations were said to violate Section 11 of the Securities Act of 1933 ("the 1933 Act").

its executives (collectively, the "officers"),[2] with misleading statements and omissions and with "guiding" misleading forecasts by independent analysts. These statements, omissions, and indirect forecasts are said to have misrepresented Hologic's business prospects, artificially inflated stock prices, and thereby perpetrated a "fraud upon the market" in violation of § 10(b) of the Securities Exchange Act (the Act"), 15 U.S.C. § 78j,[3] and Rule 10b–5, 17 C.F.R. § 240.10b–5.[4] In Count II, Colby charges Hologic officer Joel Weinstein ("Weinstein") with "insider trading" in violation of § 10(b), in that on September 6, 1990, he sold 15,000 shares of Hologic common stock allegedly at inflated prices without the required disclosure of facts pertinent to investment.

Hologic and the officers urge the Court to dismiss Colby's suit as failing to state a valid cause of action and as insufficiently detailed to support allegations of fraud. *See* Fed. R.Civ.P. 9(b) and 12(b)(6). They deny that the challenged company statements were misleading, that they had any duty to disclose additional information about future prospects, or that they are liable for forecasts by independent securities analysts. The "insider trading" claim is said to be untenable because Weinstein claims he did not rely upon non-public information, and in any event Colby's stock purchase was not contemporaneous with Weinstein's sale.

## I. *Factual Background and Disputed Statements.*

### A. The Parties and the Undisputed Factual Background

Hologic, with offices in Waltham, Massachusetts, has since 1986 been engaged in the development, manufacture, and sale of x-ray systems and particularly bone densitometers used in the diagnosis of various bone diseases. The company is registered with the Securities and Exchanges Commission ("SEC") as a reporting company, has outstanding more than 3 million shares of common stock and an average monthly sales volume of 1.5 million shares.

The plaintiff, Wendy Colby, is a resident of New Jersey who purchased 500 shares of Hologic common stock on September 17, 1990. The investor class, as defined and putatively represented by Colby, is estimated to number in the hundreds. Over 3 million shares were traded during the class period.

The class period, as defined by Colby, corresponds to a time of considerable change and development for Hologic. The Company's main product in 1987–1990 was scheduled for replacement in 1990. Hologic's new sensitometer was expected to be shipped in

---

This third count does not appear in the Amended Complaint.

**2.** These officers are:
(1) David Ellenbogen, a co-founder of the Company who has served as President, Treasurer, and a director since its organization in 1985;
(2) Jay Stein, a co-founder of the Company who has served as Senior Vice President, Technical Director, and a director since its organization;
(3) Glenn Muir, who has served as Controller and an officer of Hologic since October, 1988; and
(4) Joel Weinstein, who has been Vice President of Marketing since 1987.

**3.** 15 U.S.C. § 78j(b) specifies:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**4.** Rule 10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of use of the mails or of any facility of any national securities exchange,
(a) To employ any devices, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

the 1991 fiscal year. Coincident with this change in product lines, Hologic shifted its marketing posture, initiating direct sales in the United States while anticipating expansion of its indirect European sales in 1989 through agreements with General Electric CGR S.A. ("General Electric") in France and Siemens A.G. ("Siemens") in Germany. There were significant delays, however, both in completing and shipping the new sensitometer product and in signing new contracts with the European distributors.

Hologic stock prices reached a peak of $22.75 per share during the class period. After reductions in European sales and Hologic's November 15, 1990 disclosure that it would not meet previously projected earnings, however, the market price of the common stock dropped $6.25 in a single day, falling from $15 per share on November 15, 1990, to $8.75 on November 16, 1990, the end of the class period.

### B. Challenged Statements and Allegations

Colby claims that Hologic and its officers schemed to inflate Hologic's stock price by creating the illusion the company was growing rapidly and would continue to grow throughout 1990–91. This was allegedly accomplished, in particular, through four misleading statements and omissions by Hologic, its officers, and several independent analysts who were "guided" by the defendants.[5] The challenged statements are summarized as follows:

1. **Hologic,** in a July 31, 1990 press release, reported substantial earnings for the third quarter of 1990, and President Ellenbogen stated "while we do not expect to maintain this rate of growth in the fourth fiscal quarter due to seasonal variations in order rates from Europe, prospects for long-term growth in the bone densitometry market are bright." Pl.Ex. 3, at 2.

2. **Reuters** news service noted, on July 31, 1990, a fall in value of Hologic stock after weaker earnings than "analysts had expected," but quoted a *Needham analyst* who said, "the slightly weaker forecast for the fourth quarter was a short term problem.... Hologic expects that the market for bone densitometers will grow." Pl.Ex. 4, at 1.

3. **Adams Harkness and Hill** ("Adams"), an independent analyst, observed on August 1, 1990 that "some believe [Hologic's] business may be slowing, based on management's statement that fourth quarter growth will be affected by vacation-related variability in orders coming in from European distributors." Still, Adams predicted, "we see strong sales" from Europe, and described Hologic as "a small company growing very rapidly," and projected healthy earnings through fiscal 1992. Pl. Ex. 5, at 1.

4. **Professional Investor Report** ("PIR") news service, on September 17, 1990, interviewed Muir of Hologic who said, "the company hasn't gotten any indication from [foreign purchasers] that orders this go-round will be disappointing in any way" and that he is "not aware of any long term or short term negative trends that might affect Hologic's business." Muir was said to be "comfortable with a wide range of street estimates" of Hologic earnings, considering it "too early to strongly project earnings for next year." Pl.Ex. 6.

Direct misrepresentation is said to lie in the July press release by Hologic (no. 1, above) because the company's forecast as to future sales was not "reasonably based" on "timely" and "reliable" information. Am. Compl. at ¶¶ 17–18. Muir's optimistic declarations (no. 4, above) are also described as misleading because he failed to disclose indications of a slowing "negative trend." *Id.* at ¶¶ 22–23.

5. Colby also cites a fifth statement made by Hologic in a November 15, 1990 press release. There, the company announced disappointing 1989 fourth quarter results, and acknowledged "uncertainty ... due to a continued slowing of orders from Europe ... and some delays in orders from customers awaiting the availability of the [new Hologic sensitometer] QDR–2000." Pl. Ex. 7 at 2. Colby cites this fifth statement only to show that prior challenged statements about Hologic prospects were misleading. Colby stresses in particular the reference in the November 15th press release to *"continued* slowing of orders from Europe." *Id.* at 24 (emphasis Colby's).

Indirect fraud is imputed to Hologic because the Needham analyst's forecast (no. 2, above) was said to be "premised upon" discussions with Hologic representatives. The Adams report (no. 3, above) is likewise charged against Hologic because the analyst "gave the company an opportunity to preview the projections" and Hologic failed to disclose the beginning of a slowdown in orders. *Id.* at ¶¶ 20–21.

## II. *Assessing Securities Fraud Complaints under Rule 9(b).*

■ Dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is generally inappropriate unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). This Court must take all the allegations as admitted and must liberally construe all inferences in favor of the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).[6] A plaintiff asserting fraud may not lean too heavily on a court's hesitance to dismiss, however, since Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity."

The First Circuit has been especially strict in applying Rule 9(b) to securities fraud complaints out of concern that "a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence." *New England Data Services, Inc. v. Beecher,* 829 F.2d 286, 288 (1st Cir.1987). *See also Hayduck v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985). In *Romani v. Shearson Lehman Hutton,* 929 F.2d 875 (1st Cir.1991), this Circuit demonstrated its readiness to dismiss a "fraud on the market" complaint which failed to "meet the Rule 9(b) threshold" because plaintiffs failed to allege "in some detail the facts and figures upon which their claims of misrepresentation were based." *Id.* at 880.

■ The two elements of "fraud on the market" claims which are subjected to the closest scrutiny under Rule 9(b) are (1) whether there was a material misstatement or omission by the defendant, and (2) whether there was scienter. *Backman v. Polaroid Corp.,* 910 F.2d 10, 15–16 (1st Cir.1990); *Holmes v. Bateson,* 583 F.2d 542, 551 (1st Cir.1978).[7] The foundation for these two elements must be visible in the complaint which must specify the "time, place and content of an alleged false representation." *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980).

■ A *misrepresentation* is "material" to a claim of securities fraud only if the misstated or omitted fact was one likely to be viewed by the reasonable investor as significantly altering the total mix of available information. *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 445, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976). A complaint mounted upon § 10(b) or Rule 10b–5 must offer a sufficient allegation of "materiality," *i.e.* enough information to ascertain the significance of the misrepresentation based upon the indicated probability that the (described or omitted) event would occur and the anticipated magnitude of the event upon the totality of company activity. *Basic, Inc. v. Levin-*

---

6. The defendants' motion to dismiss is not transformed into a motion for summary judgment under Fed.R.Civ.P. 56 by virtue of the presence of several exhibits attached to the Complaint. The exhibits are copies of the allegedly misleading statements which are the basis of the claim and, as such, may be properly considered when ruling on a motion to dismiss. *Fudge v. Penthouse International, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988).

7. A plaintiff's "due care" and "reliance" upon a defendant's misrepresentation are described in *Kirby v. Cullinet Software,* 721 F.Supp. 1444 (D.Mass.1989) (Wolf, J.) and *Holmes* as additional elements of a Section 10(b) or Rule 10b–5 action. However, the "reliance" requirement was set aside for "fraud on the market" claims in *Basic, Inc. v. Levinson,* 485 U.S. 224, 246–47, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988). Reliance is now presumed and plaintiffs are held entitled to rely upon the "integrity of the market" and information publicly released by corporations and their agents or employees. Closely related to reliance is the "due care" element of common law fraud which is, almost by definition, a question of factual dispute not easily resolved in a motion to dismiss or by summary judgement.

*son,* 485 U.S. 224, 238, 108 S.Ct. 978, 986, 99 L.Ed.2d 194 (1988).

The *scienter* requirement of Rule 10b–5 requires plaintiffs to prove "an intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). A plaintiff need not, however, describe the circumstances from which fraudulent intent can be inferred, *Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 13–14 (1st Cir.1984), and the First Circuit has upheld complaints based upon allegations of "recklessness amounting to indifference." *See Hoffman v. Estabrook & Co.,* 587 F.2d 509, 516 (1st Cir.1978). Even so, to survive a motion for dismissal such a complaint must contain, at a minimum, "factual allegations that would support a reasonable inference" that "circumstances adverse" to the defendant's statements "were known and deliberately or recklessly disregarded" at the time the statements were made. *Romani,* 929 F.2d at 878. A plaintiff is not released from this obligation to plead specific supporting facts even where "the fraud relates to matters particularly within the knowledge of the opposing party." *Wayne Investment,* 739 F.2d 11, 14.

In stretching her particular allegations over this general framework, Colby incurs three additional obligations under Rule 9(b):

First, since Colby's case is based on omissions and erroneous forecasts (rather than direct misstatements), she must offer factual indications that Hologic's omissions violated a duty to make further disclosure, *Backman,* 910 F.2d 10, 12–13; or that Hologic's forecasts were not reasonably based or were not made in good faith. *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1450 (D.Mass.1989) (Wolf, J.).

Second, since the analysts' reports are sought to be imputed to the defendants as part of their scheme, she must offer allegations that the reports could be fairly attributed to Hologic itself and its officers must be so "entangled" with the analysts' forecasts such that they assumed a duty to disclose the analysts' errors. *Elkind v.*

*Liggett & Myers, Inc.,* 635 F.2d 156, 163 (2nd Cir.1980).

Third, since she would prove a concerted "scheme" among the defendants, she must, in order to show *scienter,* particularize the role of each in the fraud. *Hurley v. Federal Deposit Insurance Corp.,* 719 F.Supp. 27, 31 (D.Mass.1989) (Tauro, J.).

The lack of allegations of direct misrepresentations of fact by the defendants (as opposed to imputed statements and erroneous predictions of future events) leaves Colby's complaint vulnerable to dismissal under Rule 9(b) as discussed below:

III. *Colby's Allegations against Hologic.*

A. Misleading Forecasts?: Hologic's July 31, 1990, Press Release (Statement No. 1).

The July 31, 1990 press release by Hologic and its president included the following key passages:

[1]	declaration—20% earnings for 3d quarter, fiscal 1990

[2]	forecast I—"We don't expect to maintain this rate of growth" ·

[3]	explanation of forecast I—"seasonal variations—orders (Europe)"

[4]	forecast II—"prospects for long term growth are bright" ·

[5]	explanation of forecast II—positive results—recent drug studies

Colby does not dispute Hologic's statement of earnings [1], or the pessimistic short-term forecast [2] with explanation [3]. Rather, she claims that the statement "prospects for long term growth are bright" [4] was misleading because Hologic's president had "no reasonable basis" from which to prepare projections for the fourth quarter and beyond. In support of this argument, Colby asserts that there was an "informational void" within the company due to the inexperience of the domestic sales force, the recent execution of the contracts with European distributors, and inadequate information and delays in meetings with European distributors. Am. Compl. ¶¶ 32–34.

Colby asserts that Hologic's comment that "long term prospects are bright" is

sufficiently "material" to sustain her claim. Certainly, predictions "are not exempt" from the securities laws, *Kirby*, 721 F.Supp. 1444, 1449, but they are actionable only if the forecast might affect a "reasonable investor" in contemplating the value of a corporation's stock. *Holmes*, 583 F.2d 542, 552.

Hologic's vague "bright prospects" comment offers no projections of earnings or sales statistics, nor even a temporal reference point. Such empirical data have been crucial in cases finding forecasts material, including those cited by Colby.[8] Hologic's projection is more akin to those found too nebulous to support a securities fraud claim. Notably, in *Priest v. Zayre Corp.*, 1987 WL 10741 (D.Mass. May 1, 1987) (Zobel, J.), the company's statement that it "was poised to continue its steady growth in the coming year" was held inadequate, as the court declared:

> Optimistic, vague projections of future success which prove to be ill founded are not, without more, sufficiently material to incur Rule 10B-5 liability. When, however, such projections are accompanied by either specific qualifications of projected results implying certainty (e.g., earnings shall increase at least 30% next year) or statements of fact which prove to be erroneous, then such statements can be the basis of Rule 10b-5 liability.

*Id.* at *2. *See also Elkind*, 635 F.2d 156, 164 (company's declaration that "we expect another good year in 1972" not materially misleading).

A reasonably well informed investor could not reasonably have considered Hologic's bare "long term prospects are bright" comment to be so significant as to alter the mix of information bearing on investment. The "forecast" is not material as matter of law.

The lack of **scienter** is also independently fatal to a claim based upon the July 31st press release. While the "time, place, and content" of that press release are provided, this is, standing alone, insufficient without "supporting facts" indicating fraud, *Wayne*, 739 F.2d at 13. Nor may a plaintiff rest upon "mere allegations of fraud, corruption, conspiracy ... or referrals to plans or schemes ... no matter how many times such accusations are repeated." *Hayduk*, 775 F.2d at 444. Allegations that a prediction was fraudulent must offer "supporting facts" indicating that the defendant did not act in "good faith" or had no "reasonable basis" for the forecast. A "reasonable basis" exists if the defendant relied upon an historical or contemporary body of facts and a "reasonable method of preparation." *Kirby*, 721 F.Supp. at 1450 (citing *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489 (9th Cir. 1974)).

There is good reason for the courts to discourage complaints based on allegedly misleading generalized forecasts. Such forecasts are inherently difficult and unreliable, though necessary, and are not likely to be "material" to investors. The Securities Exchange Commission recognized this in adopting the "Safe Harbor Rule," which provides that projections filed with the Commission do not violate federal securities law unless it is shown that they were made without a "reasonable basis" or were not made in "good faith."[9]

---

8. Colby's cited authorities are easily distinguished on this basis. *See e.g., Kirby*, 721 F.Supp. 1444, 1446 (defendant company offered "expected growth" and "operating margin" percentages for the coming year); *Eisenberg v. Gagnon*, 766 F.2d 770, 775 (3d Cir.1985) (offering memoranda projected IRS policies, amounts of coal reserves and ability to mine them); *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 488 (9th Cir.1974) (defendant officer forecast total revenue and earnings per share).

9. The "Safe Harbor Rule," 17 C.F.R. § 230.175 (1988), specifies:

(a) A statement within the coverage of paragraph (b) of this section ... shall be deemed not to be a fraudulent statement ... unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.

(b) This rule applies to the following statements:

(1) A forward looking statement ...

(c) For purposes of this rule, the term "forward looking statement" shall mean and shall be limited to:

(1) A statement containing a projection of revenues, income loss, earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

(2) A statement of management's plans and objectives for future operations:

The "basis" for Hologic's challenged July 31, 1990 forecast of "bright future prospects" was explicit in the statement's reference to (1) encouraging earnings in three previous quarters of that fiscal year, and (2) recently published "osteopathic drug studies." Nowhere has Colby challenged the accuracy of those reported earnings or the positive implications of the cited drug studies for the future marketing of Hologic's product. Instead, it is alleged only that the sales and order data then available to Colby was "untimely" or "unreliable" or inadequately processed. Such charges, taken as true for purposes of dismissal, are essentially criticisms of Hologic's management, "[o]nly fraud, [however,] not poor management or even gross mismanagement is actionable under the securities laws." *Boyle v. Merrimack Bancorp, Inc.*, 756 F.Supp. 55, 58 (D.Mass.1991).

Here, based on historical earnings data and the contemporary facts and inferences of the drug studies, there was a "reasonable basis" for the forward looking statement of July 31st. The allegations of scienter are thus insufficient to sustain any claims of misrepresentation based upon that press release.

### B. Misleading Silence?: Muir's Press Interview on September 17, 1990 (statement No. 4).

Muir, Hologic's controller and principal spokesperson, was interviewed by Professional Investor Report on September 17, 1990, and was reported as making the following challenged statements:

[1] forecast I: Hologic "hasn't gotten any indication from either GE or Siemens that orders this go round will be disappointing in any way."

[2] forecast II: Muir is "unaware" of "negative trends, either short or long term, that might be affecting the Company's business."

[3] declaration I: Muir is "comfortable with a wide range of street estimates" for fiscal 1991 earnings.

(3) A statement of future economic performance contained in management's discussion

[4] explanation of declaration I: "It is very early to more strongly project earnings for next year ... we'll get a clearer picture as we move forward."

Colby advances two challenges to the Muir interview. First, she claims that forecasts I and II (passages [1] and [2] above) were "not reasonably based" because Hologic was already experiencing a slowdown in orders and was becoming unable to project future orders. Am.Compl. ¶ 39.

Second, Colby attacks Muir's acceptance of a "wide range" of analysts' estimates and his unwillingness to forecast earnings (numbers [3] and [4] above) as misleading because Muir "should have disclosed" a "developing negative trend." *Id.*

With respect to the challenged **forecasts** (passages [1] and [2] above) the analysis of scienter and materiality above which led to the conclusion that Hologic's July 31 press release was not actionable again applies with the same conclusion. It is undisputed that Hologic had not yet met with its European distributors when Muir stated that he had "no indication" that their orders would be "disappointing." Scienter is said to lie in Colby's claim that "the company was already experiencing a slowdown in orders;" but the complaint does not specify any sources of that information or facts suggestive of a "slowdown" at the time of Muir's September 17th press interview. *See* Am.Compl. ¶¶ 37, 39. Instead, the Complaint infers a slow down existed on September 17th solely from Hologic's November 15th announcement that earnings in 1991 would fall due to "a *continued* (Colby's emphasis) slowing of orders from Europe after a very strong sales year in Europe in 1990." Am.Compl. ¶ 42.

These allegations of scienter without specified sources or supporting facts are based implicitly upon information and belief alone, and so must be regarded as speculative and fatally defective under the standard of *Wayne Investments*, 739 F.2d at 13–14. No facts are offered to indicate that these forecasts were made in bad faith, and such barren allegations cannot stand against the standard raised under *Hayduk*, 775 F.2d at 444.

and analysis of financial condition and results of operations. . . .

The materiality of Muir's stated unawareness of "negative trends" is also dubious, where Muir makes no reference to any time line or empirical data indicating any expectations of sales or earnings. *See Priest,* 1987 WL 10741, at *2.

Colby also challenges Muir's **silence**—failing to disclose a "developing negative trend" in light of his declarations (passages [3] and [4] above) that he was "comfortable" with a wide range of analysts' estimates because it was "too early to strongly project" Hologic's earnings. Am.Compl. ¶ 39. Muir's refusal to forecast Hologic's earnings for the analysts can be "misleading" only if he had a duty to make further disclosure. It is well settled that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). Such a duty does not arise merely because investors may be interested in withheld information. *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26 (1st Cir.1987).

*Backman v. Polaroid Corp.,* 910 F.2d 10 (1st Cir.1990) held that a duty to disclose arises only to correct or update what would otherwise be a materially misleading prior statement by the defendant. *Backman,* 910 F.2d at 16–17. Colby has pointed to no prior affirmative statements by the defendants, and (as noted above) her challenges to their vague prior forecasts are not actionable.

The facts of *Backman,* no less than its general rule, mandate a rejection of Colby's non-disclosure claim. Backman led a class of Polaroid stock purchasers who challenged as misleading the corporation's advertisements of itself as a "growth company" and a particular quarterly report which announced record sales and earnings and extolled its new product, Polarvision. That report also mentioned that Polarvision was sold below cost, but did not disclose the scale of losses and lagging sales for that product. *Id.* at 15–16. The First Circuit pronounced Backman's complaint to be "dead on arrival," stressing that Polaroid was not obliged to disclose the extent of losses so long as management did not know at the time of the report that the product was a "commercial failure." *Id.* at 13, 16.

Colby's complaint is weaker than Backman's. Hologic's prior "bright prospects" comment is as vague as Polaroid's "growth company" advertisement, but Hologic's July 31, 1990 balancing prediction that "we do not expect to maintain this [high] rate of growth" is more cautionary than the overall tenor of Polaroid's challenged quarterly report. Most importantly, Colby offers no facts to suggest that Hologic's orders were already slowing on September 17 when Muir refused to project earnings or choose among a "wide range" of analysts' forecasts. By contrast, Polaroid **knew** of mounting Polarvision losses when it published the quarterly report which noted increased product costs but did not quantify the scale of Polaroid's losses or mention declining production. *Backman,* 910 F.2d at 16. If Polaroid owed no duty of further disclosure because "what was revealed [was] not so incomplete as to mislead," *id.* at 13, 16, then no such duty can be imputed to Hologic.

In short, the complaint has not advanced a cognizable securities fraud claim on the basis of direct statements or omissions made in the course of either Hologic's July 31 press release or Muir's September 17 interview.

**C. The Imputation of Analysts' Statements to Hologic.**

Two independent analysts' forecasts of Hologic earnings are sought to be imputed by Colby to Hologic and the other defendants as a basis for Rule 10b–5 liability. The "Needham analyst" in a *Rueters* July 31, 1990 news account stated that Hologic's weaker forecast for fourth quarter, 1990, was a "short term problem.... Hologic expects that the market [for its product] will grow." Pl.Ex. 4, at 1. The "Adams, Harkness and Hill" market specialists predicted "We see strong sales," and described Hologic as "a small company growing very rapidly." Pl. Ex. 5, at 1.

Neither of these analysts directly quoted or paraphrased any Hologic officers, nor did they make reference to allegedly misleading information provided by the company. Both reports were presented as independent opinions and neither referred to any role of Ho-

logic or its officers in the preparation, approval, or editing of the articles or data presented.

Colby argues that the analysts' views may nevertheless be attributed to Hologic because the company "guided" the analysts. It is said to have been Hologic's policy for its officers to "meet or speak with securities analysts on a regular basis" and to give "detailed guidance to these analysts" with respect to company performance and prospects. Am.Compl. ¶ 26. The analysts, Colby says, "gave Hologic the opportunity to review and comment" upon their reports "prior to issuance." As a consequence of this "guidance" it is said that Hologic effectively "adopted" the analysts' reports and, by its silent acquiescence, violated its duty to correct their mistaken forecasts. *Id.* at ¶ 27.

The First Circuit has not yet determined when independent reports of analysts or journalists may be imputed to a Section 10(b) or Rule 10b–5 defendant. Jurisprudence elsewhere is divided.

More restrictive courts have flatly "refused to impose an affirmative duty on a corporation to correct misstatements about it by third parties." *In re Comm. Oil/Tesoro Petroleum Corp. Securities Litigation,* 467 F.Supp. 227, 240 (W.D.Tex.1979). *See e.g., Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 949 (2d Cir. 1969) (defendant with advance knowledge that analysts' column was inaccurate, but who was not the source for the article, had no duty to correct misstatement). In a similar vein, imputation has been permitted only to a defendant who "had complete control" over the content of the publication. *Schwartz v. Novo Industri, A/S,* 658 F.Supp. 795, 799 (S.D.N.Y.1987).

Alternatively, some courts have allowed attribution of articles by third parties to corporate defendants *if* corporate reports or officials are directly quoted *and* are materially misleading as to "a statement of fact" rather than "merely opinions." *In re Columbia Securities Litigation,* 747 F.Supp. 237, 245 (S.D.N.Y.1990). *See also Milberg v. Western Pacific RR Co.,* 51 F.R.D. 280, 282 (S.D.N.Y. 1970) (no liability unless complaint alleges and publication indicates that misleading statements of fact were made by corporate officials); *Hershfang v. Citicorp,* 767 F.Supp. 1251 (S.D.N.Y.1991) (analysts' articles not actionable despite direct quotation of corporate officials who offered opinions but not statements of fact).

The Second Circuit's ruling in *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156 (2d Cir.1980) is particularly illuminating in this context. There, Liggett's practice of examining and commenting upon analysts' draft reports regarding company operations was held not to oblige the company to correct overly optimistic forecasts or to disclose the company's own less sanguine expectations. *Id.* at 162–63. Such systematic involvement was deemed to fall short of "an implied representation that the information they have reviewed is true or at least in accordance with the company's views." *Id.* at 163. Nor did the company officers' declarations that "[we] expect another good year in 1972" in meetings with analysts allow disappointed investors to bring claims based upon those analysts' subsequently hopeful forecasts. *Id.* at 164. The Second Circuit concluded that sophisticated and experienced analysts are not so easily led astray, and ruled that dismissal of Rule 10b–5 claims based upon imputed statements is appropriate unless a defendant

> "sufficiently entangled itself with the analysts' forecasts to render those predictions attributable to it ... [by placing] its imprimatur, expressly or impliedly, on the analysts' projections."

*Id.* at 163.

Allegations of corporate "guidance" far more specific and direct than those offered by Colby against Hologic failed to withstand a dismissal challenge in *Hershfang.* There, the *Wall Street Journal* reported repeated meetings and quoted Citibank officers' optimistic declarations to securities analysts who then reported favorably on the bank's prospects and quoted the officers at length. Fed. Sec.L.Rep. at ¶ 90,381–82. Later, after dividends crashed, the bank president acknowledged "We were warned about real estate two years ago, we were warned again a year ago, and we pooh-poohed it.... Now I'm

damned embarrassed." *Id.* at ¶ 90,382. The plaintiff argued to no avail that the officers' statements in meetings with analysts and the officers' later admission of disregarded warnings of corporate trouble at these meetings were sufficient to allege a fraudulent scheme to promote the analysts' misleading projections. The court dismissed the claims and admonished:

> The complaint must rise or fall on allegations about defendants' conduct and not on wide-eyed citation to the gratuitous commentary of outsiders.
>
> .    .    .    .    .
>
> The complaint as a whole alleges simply that defendants' optimism about Citibank prospects turned out wrong. Missing are any facts or identified circumstances that would generate an inference of guilty knowledge.

*Id.* at ¶¶ 90,383, 90,385.

Colby cannot bell Hologic with the two analysts' statements offered in her complaint.[10] No Hologic reports or officials are quoted in those two articles, nor are any misstatements of **fact** by any of the defendants to the analysts described. There are only vague claims of misleading company "guidance" which is entirely unspecified as to "time, place, or content" of the acts of the individual defendants in leading the analysts astray. Such gossamer allegations cannot bear the weight of the scrutiny necessary under Fed.R.Civ.P. 9(b) as described above.

## IV. *Insider Trading.*

The essential elements of an insider trading claim as generally derived from *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 1471–72, 31 L.Ed.2d 741 (1972), include: (1) trading in securities by corporate insiders (2) while withholding material inside information (3) which they have a duty to disclose to the investor public. Count II of Colby's complaint charges that Weinstein violated a duty to refrain from trading Hologic stock before disclosure of material adverse facts to which he was privy as an officer. These "material adverse facts" are said to have been the artificial inflation of Hologic stock prices by the collective concealment and misrepresentations alleged in the Count I claim.

Colby's "insider trading" claim fails for two reasons, each of which is independently sufficient. First, as noted above, Colby has not sufficiently alleged what "materially adverse information" any defendant possessed during the "class period" and hence there can be no duty to avoid trading or to make disclosure to equalize knowledge of insiders and the investing public.[11] There are no allegations that Weinstein knew more than other defendants, whose alleged "materially adverse" knowledge of Hologic's decline in September is largely inferred form their November acknowledgement of "continued" declining sales. That sort of inferred omission by hindsight admission is rejected herein as a basis for a duty to disclose.

Second, Colby's purchase of stock is not sufficiently "contemporaneous" with Weinstein's sale to afford her standing for an insider trading claim. Weinstein sold his shares on September 6, 1990; Colby purchased her share eight trading days later on September 17, 1990. While the First Circuit has not yet ruled on this issue, this Court is persuaded by the reasoning advanced by

---

**10.** The authority offered by Colby suggests no rule more friendly to her cause, since nearly all the cases sustaining complaints against dismissal involved corporate defendants who were **quoted** as making misstatements of **fact** in articles by journalists or securities analysts. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 227–28, 108 S.Ct. 978, 981, 99 L.Ed.2d 194 (1988) (president quoted in newspaper as denying fact of merger negotiations, which were underway); *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986) (president quoted as predicting amount of sales; numerous other inaccuracies quoted in two publications). *But see Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598 (N.D.Cal.1991) (two articles alleged-

ly drawn from information passed to analysts by company are imputed and actionable as misleading even though corporate defendant was not directly quoted).

**11.** Judge McNaught, in *Backman v. Polaroid Corp.,* 540 F.Supp. 667, 670 (D.Mass.1982), stressed that liability for insider trading is "dependent . . . upon whether the defendant is obligated to disclose the inside information." *See also Fridrich v. Bradford,* 542 F.2d 307, 326–27 (6th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977).

Judge McNaught in *Backman v. Polaroid Corp.*, 540 F.Supp. 667 (1982). The *Backman* ruling adopted the Second Circuit "contemporaneous trading" standard which presumes that investors are only affected by temporally proximate insider trades. *Id.* at 669; *see Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88 (2d Cir.1981).[12] The investors in *Backman* purchased stock two and seven trading days, respectively, after sales by Polaroid insiders who possessed material information on revised corporate earnings. This two day interval was enough to deny the plaintiffs standing as "contemporaneous" traders. *Backman*, 540 F.Supp. at 671.[13]

Against the obvious barrier of *Backman* and parallel jurisprudence, Colby calls for more liberal standing rules following what Colby reads as the general principle enunciated in *Shapiro v. Merrill Lynch, Fenner & Smith, Inc.*, 495 F.2d 228, 238 (2d Cir.1974), which held that the duty of insiders not to trade was owed to all who purchased stock while inside information remained undisclosed. The open door to liability seemingly afforded under *Shapiro*, however, was most emphatically closed by the Second Circuit in *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94 (1981) where, in denying standing to the plaintiff, the court stressed "[a]ny duty of disclosure is owed only to those investors trading contemporaneously with the insider."

There are persuasive policy considerations which underpin the "contemporaneous" standing requirements of evolving federal common law. The unfair advantage presumably possessed by insiders dissipates rapidly, in part because their trading transactions are followed and reported by securities analysts.[14] *See generally Fridrich v. Bradford*, 542 F.2d 307, 326 (6th Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977). Moreover, to extend liability "well beyond the time of the insider's trading could make the insider liable to all the world." *Wilson*, 648 F.2d at 94. It is notable that for claims mounted under Section 20A of the Exchange Act Congress has explicitly mandated that the insider trading must occur "contemporaneously." 15 U.S.C. § 78t–1(a). These policy considerations apply to restrain open ended liability in the case brought by Colby. In the period between Weinstein's September 6th sale of stock and Hologic's November 15th disclosure of the allegedly "inside" information, over two million shares of Hologic stock are said to have changed hands. Def.Reply at 16.

Colby's insider trading claim must be dismissed, both because it fails sufficiently to allege Weinstein's duty to disclose information and because Colby, who purchased shares eight trading days after the Weinstein sale, lacks standing herself to bring this claim and is not a suitable representative of others who might perhaps press it.

## V. *Dismissal of the Complaint.*

Since both of Colby's counts fail under the standards erected in Fed.R.Civ.P. 9(b), this complaint must be dismissed in its entirety.

The First Circuit has underscored the appropriateness of dismissal without leave to amend a complaint where "even at oral argument, before this court, plaintiff failed to indicate specifically how he would amend the complaint so as to comply with Rule 9(b)."

---

**12.** Judge McNaught rejected the Sixth Circuit causation-in-fact rule, i.e., that plaintiffs must show the direct effect of insider trading on their own investment decisions. *See generally Fridrich*, 542 F.2d 307.

**13.** *Accord Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1521–22 (N.D.Cal.1990) (citing with approval dismissal of non-contemporaneous claims by plaintiffs trading two, four, and seven days after insiders); *Kreindler v. Sambos's Restaurants, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 98,312, 1981 WL 1684 (S.D.N.Y.1981) (purchase seven days after insider's sale not contemporaneous).

**14.** Jonathan Macey and Geoffrey Miller argue in their provocative article, *An analysis of Fraud on the Market Theory*, that the "pro-disclosure tilt of the securities laws" has been exaggerated. 42 Stan.L.Rev. 1059, 1073 (1990). They also challenge, through a cost benefit analysis, the Supreme Court's view in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) that disclosure by insiders protects the overall efficiency of the market. *Id.* at 1074.

*Romani*, 929 F.2d at 881.[15] In the case at bar, Colby likewise has failed to outline what facts might be discovered to support her securities fraud allegations.

The defendants here ought not to be subjected even to some limited discovery by Colby in the hope that she may find some basis for her allegations of fraud. *See Boyle* 756 F.Supp. at 59. *See generally* Judicial Improvements Act of 1990, title I., Pub.L. No. 101–650, 104 Stat. 5089 (codified at 28 U.S.C. §§ 471–482 [Supp.1992]); Comment to Article II, Discovery, in the Expense and Delay Reduction Plan of the United States District Court, District of Massachusetts, order of Nov. 18, 1991, 583 N.E.2d cxii, cxxvi (1992); Council on Competitiveness Working Group on Civil Justice Reform, Agenda for Civil Justice Reform in America (Aug. 1991); Donald R. Frederico, The District of Massachusetts Civil Justice Expense Delay Reduction Plan, 2 Litigation Management & Economics 11, 12–13 (1992). Nearly ten months elapsed from the filing of this case to its evolution through two complaints with accompanying motions and oral arguments. The amended complaint offers little improvement over the original in the way of particularized averments of materiality, scienter, or duty to disclose. Moreover, it appears to a certainty that further discovery could not provide a remedy for Colby's lack of standing to advance Count II (insider trading).

While the federal rules of civil procedure are intended to promote access to the courts through simplified pleading requirements, the danger of groundless "strike suits" which allege fraud in hopes of a settlement offer from corporate defendants threatened by expensive discovery and litigation costs is well recognized. *See New England Data*, 829 F.2d at 288. *See generally* Baskin, *Using Rule 9(b) to Reduce Nuisance Securities Litigation*, 99 Yale L.J. 1503, 1594 (1990). Colby has pled her case with determined imagination but little factual substance. Considerations of fairness, judicial economy, and congressional purpose in enacting the Securities Laws all point to a denial of discovery and to dismissal of this complaint with prejudice.

SO ORDERED.

---

**15.** The claims advanced in the failing *Romani* complaint are not unlike those in the present case. There, losing investors in a horsebreeding limited partnership charged defendant managers and brokers with a scheme to "lure investors" through statements which extolled the partnership in "glowing terms" while withholding information pertinent to the horse industry in general and the management and financial condition of the partnership in particular. *Id.* at 877. The First Circuit dismissed Romani's complaint for failure to offer "factual allegations that would support a reasonable inference" that circumstances adverse to those generalized predictions "existed at the time of the [statements] and were known or deliberately or recklessly disregarded by the defendants." *Id.* at 878.