Gross v. Summa Four          CV-94-364-B    11/08/95

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE


David Gross

    v.                                      Civil No. C-94-364-B

Summa Four, Inc., et al.



**MEMORANDUM AND ORDER**

This is a securities class action brought by David Gross as
representative of an uncertified class, against Summa Four, Inc.,
and certain of its officers and directors[1] ("the Defendants"),
for claims arising under §§ 10(b) and 20(a) of the Securities
Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b) and 78t(a) (West
1981), Securities Exchange Commission Rule 10b-5, 17 C.F.R. §
240.10b-5 (1994), and related common law.  Gross alleges, on
behalf of all persons who purchased the common stock of Summa
Four from January 18, 1994 through July 5, 1994 ("the Class
Period"), that the Defendants perpetrated a fraud-on-the-market.
Specifically, he claims the Defendants falsely and recklessly
mislead the investing public through statements and omissions
made during the Class Period which artificially inflated the
market price of the company's common stock.  The Defendants moved
to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), after

---

[1]  The individual defendants are Barry Gorsun, current
president, CEO and Chairman of the Board; James J. Fiedler,
president and director from July 1993 through July 1994; John A.
Shane, director since 1976; William M. Scranton, director since
1976; and Robert A. Degan, director since 1984.

plaintiff filed his first amended complaint.  For the following reasons, I grant Defendants' Motion to Dismiss.


## I.  FACTUAL BACKGROUND

Because this case is before me on the Defendants' motion to dismiss, I recite the extensive factual background in the light most favorable to the plaintiff.  Berniger v. Meadow Green-Wildcat Corp., 945 F.2d 4, 6 (1st Cir. 1991) (court must accept all facts in complaint as true, drawing all reasonable inferences in plaintiff's favor).

### A.  Summa Four

Summa Four is a Delaware corporation with its principle executive offices located in Manchester, New Hampshire.  It develops, distributes, and services, both domestically and internationally, switching systems and advanced signaling solutions for telephone companies.  ¶¶ 12, 34, 35.[2]  Sales of its products are directly to end-users of these systems as well as through telecommunications systems integrators, including IBM and Digital Equipment Corporation.  ¶ 35.  The SDS series of distributed switching systems and the Portico SS-7

---

[2]  All paragraph references are to the plaintiffs' First Amended Complaint.

internetworking product are its leading products.  ¶ 36.

On September 23, 1990, Summa Four completed its initial public offering ("IPO") and provided a prospectus in which it portrayed the company as expanding and "poised for rapid growth." ¶ 38.  The individual defendants sold a portion of their common shares into the IPO, but retained a substantial quantity of those shares.  ¶ 39.  As provided in a "lock-up" agreement, these retained shares could not be sold until 180 days after the date of the IPO prospectus.  ¶ 39.

In late 1993, the company, through its officers as well as press releases, touted the progress and prospects of the company. ¶¶ 40 - 41.  Summa Four had regular, extensive, and non-public contact with various stock market professionals, analysts, and money managers, including analysts from Montgomery Securities and Cruttenden & Co.  ¶ 42.  At least with respect to the analysts from Cruttenden & Co., Summa Four conveyed detailed information regarding its business and operations not available to the public.  ¶ 42.  As a result of these contacts, the analysts released "extremely positive" reports.  Newspapers, including the Manchester Union Leader, quoted these statements in articles printed during October 1993.  ¶ 43.

3

On November 15, 1993, Summa Four issued a press release indicating that it had entered into a world wide cooperative agreement with IBM, with initial orders over $ 1 million. ¶ 44. In December, the company issued another press release announcing expansion of its European operations and also highlighting the rapidly growing market share and opportunities of Summa Four. ¶¶ 45 - 46.

**B.    The Class Period**

During the Class Period, the Defendants, as well as market analysts, made numerous positive statements concerning the company's financial position, market potential, and sales. ¶¶ 48 - 60. Contemporaneously, Summa Four was actually experiencing downward trends evidenced by facts and events not disclosed to the public. ¶¶ 61 - 98. During the Class Period, on May 27, 1994, Gross purchased 200 shares of Summa Four Common Stock at $ 27.5625 per share. ¶ 11.

1.    Statements by the Defendants

On the first day of the Class Period, January 18, 1994, Summa Four issued a press release containing several statements. ¶¶ 48 - 50. The press release announced the company's results for the end of its third fiscal quarter, stating that its revenues were $ 7,277,000 and its net income was $ 1,852,000. In

4

addition, the president of Summa Four stated: "We are also seeing increased demand for our SDS distributed switch in a number of international markets." (emphasis added). He continued, "[t]he SDS distributed switch is becoming the platform of choice." (emphasis added). Finally, the release noted that Summa Four had received orders from Unisys, Sprint, IBM, DEC, Pacific Bell, US West and AT&T.

The Defendants made several statements in the Spring of 1994. ¶¶ 52 - 55. On April 25, 1994, they introduced a new product, stating that it was a revolutionary product and would put "carriers in a position to win back [lost] customers by providing flexible cost-effective access to overlay network services." Shortly thereafter, the Defendants reported their fourth quarter, year-end operating results for fiscal 1994, reporting revenues of $8,344,000 and net income of $1,675,000 for the quarter, and revenues of $27,257,000 and net income of $5,287,000 for the year.

In a press release issued the same day, the Defendants stated: "We see the current market continuing to expand over the next several years. ... We continue to be enthusiastic about our opportunities to grow over the next several years." ¶ 54. Furthermore, the Defendants stated they had received "significant

5

orders" for "new and existing applications, domestically and internationally," from AT&T, McCaw, Sprint, GTE, Unisys and IBM. ¶ 55.

Finally, the Defendants made statements in the 10-k form submitted to the Securities and Exchange Commission ("SEC") and in a letter to shareholders accompanying the 1994 Annual Report issued June 29, 1994. ¶¶ 59 - 60. In the 10K form, filed two weeks before the end of the quarter, the Defendants described the company in an optimistic light, stating more than once that it "anticipated growth." Likewise, in its letter to shareholders the tone was optimistic: "We have a . . . strong financial position"; "We continue to be enthusiastic about our opportunity to grow over the next several years"; "Our major goal in Fiscal Year 1995 is to continue to further leverage our market leadership position as the telecommunications industry continues to expand worldwide."

2. <u>Statements by analysts</u>

Montgomery Securities issued three favorable analyst reports regarding Summa Four, dated January 19, 1994, May 4, 1994, and May 31, 1994, based in large part on the Defendants' public statements and private communications between the individual defendants and analysts at Montgomery. ¶¶ 51, 56, 57. The

January report included the following statements: "SUMA [sic] business is very strong"; "We have increased our revenue and EPS estimates"; "For FY:1995 we have increased our revenue and EPS forecasts"; "The company is performing well with outstanding prospects. We are, furthermore, aware of several situations which could add some upside to our FY:95 forecast."

The May 4th report expressed similar optimism, stating: "SUMA [sic] business remains strong"; "We have increased our revenue estimates...and we have also increased our fiscal 1995 revenue estimate"; "The company is performing well, with outstanding prospects. We are, furthermore, aware of several situations which could add some upside to our FY:1995 forecast."

Finally, Montgomery issued a report on May 31st stating: "The Company's intermediate to long-term prospects have never looked brighter"; "The VCO [product] is an important product and should result in a greater than doubling of SUMA's [sic] addressable market to more than $300 million." In addition, the report cited a deal with AT&T which Montgomery believed had potential to Summa Four of "perhaps greater than $10 million over an 18-24 month period."

3. <u>Undisclosed, adverse facts</u>

Plaintiff delineates several facts, relying primarily on

7

internal budgetary reports, which allegedly indicate that the true state of affairs experienced by Summa Four during the Class Period belied the positive statements and optimistic predictions disseminated by the Defendants and analysts.  ¶¶ 61 - 98. Specifically, the company was unable to meet internally budgeted results of operations, the Defendants employed, or authorized, the use of undisclosed or unauthorized accounting procedures which created a false and misleading impression of its growth and prosperity and the company's international operations were "in a state of disarray and ... had a materially negative effect upon the Company's results during the Class Period."  ¶ 61.

### (a)  Summa Four was consistently off-budget during the Class Period

In December 1993, the company made an adjustment for income tax which "enabled the Company to meet or exceed analysts' predictions with regard to the Company's operating results." According to the company's internal reports, dated January 20, 1994, December 1993 revenues were $68,000 below projections, general and administrative expenses were $11,000 over budget, and research and development expenses were $37,000 over budget. Similar results were reported for the quarter ending December 31, 1993.  In addition, the report indicated that for the previous

8

nine months the company had experienced "significant cost overruns," totalling $746,000 over budget.

Both Summa Four's Monthly Operating Report and its Revised Flash Report for January 1994, indicated that revenue, gross margin, and net income fell below the forecasted budget. A similar assessment was made of the company's situation in February 1994. The company's president acknowledged to the Board that several major orders were delayed and that he would have to adjust downward the quarterly bookings forecast. ¶ 70. By March 1, 1994, Summa Four was $2,019,000, or 43.66%, behind budgeted revenues for the fourth fiscal quarter. Gross margin as well as research and development expenses were below budget by similar percentages. The February Flash Report stated that projected operating profit for the fiscal year ending March 31, 1994, was $532,000, or 13.51%, under budget. Net income reflected similar shortfalls. These trends continued through March and April of 1994.

(b) **Improper recognition of revenue during the Class Period**

According to GAAP and FASB, a company must wait in most cases until goods are shipped in order to recognize revenue for accounting purposes. ¶¶ 110 - 111. In conformance with these

9

principles, Summa Four's 10K form for fiscal 1994 states that "[r]evenue from product sales is recognized generally on shipment." Nevertheless, plaintiff contends that Summa Four improperly recognized revenue as soon as orders were received. As a result, plaintiff contends that Summa Four materially overstated its revenues during the class period. It supports this assertion with allegations that minutes for Summa Four's June 20, 1994, board meeting state that a draft revenue recognition policy had been prepared for review which "is a more formalized and somewhat more restrictive policy than was previously in place." Plaintiff also cites to a statement allegedly made by defendant Fiedler at a June 19, 1995 board meeting in which Fiedler claimed that Summa Four might be able to generate up to $4.7 million in revenues in two weeks from "orders" which had not yet been received. Since the complaint alleges that Summa Four does not ship goods until long after orders are received, plaintiff contends that this statement is evidence of Summa Four's overstatement of revenues.

### (c) International operations in disarray

In its Monthly Operating Report dated January 20, 1994, the company commented that "overall international sales and marketing efforts are currently under review and will be revised." In the

February 25, 1994 Operating Report, the company stated that it planned "a major reorganization of sales responsibilities..." in March. The refocusing of sales and marketing efforts in their international subsidiary was confirmed in the company's March Operating Report. In addition, Summa Four fired its Managing Director of European Operations that month as well as two other management team members. The company appointed a new managing director that same month.

In addition, there were indications of slowdowns with respect to certain international customers as of January 1994. In June 1994, the Board dispatched one individual "to check one more time to see if all international opportunities are abandoned at this time."

4. The July 5, 1994 Announcement

As of the June 6, 1994 "Watch Meeting," Summa Four had only shipped $4,298,720 in products, although the quarter was two thirds complete and the predicted revenues were $8.7 million by analysts and $9.025 million by the company for that quarter. The company revised its expectations for the quarter setting an additional $3.6 million in shipments as its goal for the remainder of the quarter.

11

On June 14, 1994, the Board convened by phone to address the issue again. It was determined at this point in the quarter that revenues would reach only $7.7 to 7.8 million which fell 11.49% and 14.68% behind analysts and company estimates respectively. The below budget prospects were attributed to internal disruptions experienced by regular customers as well as international orders being received at a slower rate than expected.

The Board determined that any insider trading at this point would be inappropriate and further discussed this issue at a meeting on June 20, 1994. At that meeting the Board also discussed the prospect of making an announcement concerning financial performance and guidelines for such announcements. No decision was reached at that meeting, but further review was undertaken in the subsequent weeks.

In its July 5th announcement the Defendants stated that they anticipated net revenues for the first fiscal quarter 1995 of between $7,400,000 to $7,600,000, and net earnings of $875,000 to $1,000,000. These projected results contrasted with analysts' projections which placed revenue estimates at $8.7 million for that quarter.

Following the announcement, the company's stock experienced a rapid sell-off resulting in a single-day decline of 46.6% in Summa Four's market price.

## C.   The Aftermath

The company reported its earning for the first quarter 1995 on July 19, 1994, which confirmed its announcement made earlier that month.  Summa Four replaced its president that month and attributed its failure to attain projections for that quarter on "longer than anticipated negotiation and procurement processes" of certain major customers.  This assessment was echoed by analysts' reports later that month which also contained revised estimates of the company's future prospects.  These revisions, even taking into account the delays, showed a 23.91% decrease in estimated projected earnings per share from previous estimates. Estimates of revenue generating EPS were also adjusted downward representing an 8.97% and a 13.79% decrease in revenues and earnings per share respectively.

According to Montgomery Securities, two of the six contracts needed to be closed in order for Summa Four to meet the original projections for that quarter.  In contrast, Summa Four closed only one of the six contracts.

13

Summa Four also attributed its poor first quarter of 1995 to decreased unit shipments of its SDS-1000 product in its Form 10-Q filed with the SEC on August 11, 1994. This statement is in contrast to its statements in December 1993 and March 1994 attributing increased revenues to the sale of its SDS products.

## II. STANDARDS OF REVIEW AND ELEMENTS OF THE CLAIM

Defendants argue that the complaint should be dismissed pursuant to Rule 12(b)(6) because it fails to state a claim and pursuant to Rule 9 because it fails to plead fraud with particularity.

## A. Federal Rules of Civil Procedure 12(b)(6) and 9(b)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the court to review the allegations of the complaint in the light most favorable to the plaintiff, accepting all material allegations as true, with dismissal granted only if no set of facts entitles plaintiff to relief. E.g., Berniger, 945 F.2d at 6; Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989).

In the context of a motion to dismiss a claim of fraud or misrepresentation, however, the claim must also meet the special pleading requirements of Fed. R. Civ. P. 9(b). Romani v.

14

Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991); Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). While the term "fraud" need not appear in the complaint, Rule 9 requires that the circumstances indicating fraud be stated with particularity. Simcox v. San Juan Shipyard, Inc., 754 F.2d 430, 439 (1st Cir. 1985) (although plaintiffs did not use word fraud, complaint stated with sufficient particularity circumstances entitling them to relief on a theory of fraud).

The purpose of Rule 9(b)'s particularity requirement is "to apprise the defendant of fraudulent claims and of the acts that form the basis for the claim [sic]." Hayduk, 775 F.2d at 443 (emphasis added). Specifically in the context of securities fraud cases, "Rule 9 operates to diminish the possibility that a plaintiff with a largely groundless claim [will be able] to simply take up the time of a number of other people [by extensive discovery], ... [without] a reasonably founded hope that the process will reveal relevant evidence." Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 13 (1st Cir. 1984) (internal quotations

15

and citations omitted). In order for this purpose to be adequately fulfilled, the rule requires "specification of the time, place, and content of an alleged false representation." McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980); accord Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) (general averments of defendant's knowledge of material falsity insufficient); Hayduk, 775 F.2d at 444 (conclusory allegations of fraud insufficient even if repeated several times). Further, the complaint must "set forth specific facts that make it reasonable to believe that defendants knew that a statement was materially false or misleading" when made. Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994) (quoting Serabian, 24 F.3d at 361); accord Romani, 929 F.2d at 878 (time, place, and content specificity insufficient where no factual support for inference of fraud). This requirement is not relaxed even though the bases and specific supporting facts relate "`to matters peculiarly within the knowledge of the opposing party.'" Hayduk, 775 F.2d at 444 (quoting Wayne, 739 F.2d at 14); see also Romani, 929 F.2d at 878. Allegations of fraud by hindsight are insufficient to meet these requirements. Serabian, 24 F.3d at 367 (claim cannot assume defendants knew severity of problems earlier because

16

conditions became bad later); accord Berliner v. Lotus Dev.
Corp., 783 F. Supp. 708, 710, 711 (D. Mass. 1992).

B. Elements of Claim under 10(b)

Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder, prohibit any person from, directly or indirectly, committing fraud in connection with the purchase or sale of securities.  15 U.S.C.A. § 78j(b);[3] 17 C.F.R. § 240.10b.5 (1994);[4] Rand v. Cullinet Software, Inc., 847 F. Supp. 200, 204 (D. Mass. 1994).  "In order to prevail on a rule 10b-5 claim, a plaintiff must show: (1) a material misstatement or omission by

---

[3]  Section 10(b) of the Act states in pertinent part: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...."  15 U.S.C.A. § 78kj(b).

[4]  Rule 10b-5 states in pertinent part: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange ... (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b.5.

the defendant; (2) scienter;[5] (3) reliance;[6] and (4) due care by the plaintiff." Rand, 847 F. Supp. at 204 - 05 (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730 (1975)). "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." Basic, 485 U.S. at 240; accord Rand, 847 F. Supp. at 205; Colby, 817 F. Supp. at 209. If a reasonable investor would view the misrepresented or omitted fact as "having significantly altered the total mix of information made available," then the materiality requirement is satisfied. Basic, 485 U.S. at 232 (internal quotations and citations omitted). Therefore, in pleading a claim under Rule 10b-5 in conformity with the requirements of Rule 9(b), the complaint must

---

[5] The scienter element is "...satisfied if plaintiffs 'prove an intent to deceive, manipulate, or defraud.'" Rand, 847 F. Supp. at 205. In this circuit, "recklessness amounting to indifference is an acceptable substitute." Id. (citing Hoffman v. Easterbrook & Co., 587 F.2d 509, 516 (1st Cir. 1978)). Under Rule 9(b), a plaintiff's complaint must support an inference that the defendant's knew, or should have known, that the statements were false or misleading. Romani, 929 F.2d at 878.

[6] Reliance is presumed in a fraud on the market case. Colby v. Hologic, Inc., 817 F. Supp. 204, 209 n.7 (D. Mass. 1993) (citing Basic Inc. v. Levinson, 485 U.S. 224, 246 - 47 (1988)); accord In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 - 14 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990).

18

"(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) <u>explain why the statements were fraudulent</u>." <u>Shields v. Citytrust Bancorp., Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994) (emphasis added) (internal quotations and citations omitted); <u>accord</u> <u>Suna v. Baily Corp.</u>, No. 94-273-M, slip op. at 8 (D.N.H. Nov. 10, 1994). With these principles in mind, I address the sufficiency of the plaintiff's complaint.

### III.  <u>THE COMPLAINT</u>

The challenged statements at issue fall into three categories: (1) allegedly false statements of current facts; (2) allegedly false forward-looking statements; and (3) current or forward-looking statements that were literally true, but misleading because the speaker withheld other material information on the same subject.[7]  I address each category in

---

[7] Plaintiffs allege that not only were many statements misleading when made because of the omission of material facts necessary to make the statement complete, but that the Defendants had a duty to correct statements that became misleading only after the statements were made.  ¶ 122.  The First Circuit has definitively held that no duty to correct exists if the statements were true and not misleading when made.  <u>Backman</u>, 910 F.2d at 17.  Because I conclude plaintiff failed to adequately show that the statements at issue were false or misleading when

turn.

## A.   Statements of Current Fact

"[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." Serabian, 24 F.3d at 361. "[I]f defendants reported correctly, without more, 'This is our eighth consecutive quarter in which our gross has increased,' there [is] no duty to add, for the benefit of market buyers, 'We are concerned about the next one.'" Capri Optics Profit Sharing v. Digital Equip. Corp., 950 F.2d 5, 8 (1st Cir. 1991). If the plaintiff alleges the statements were false when made, then the complaint must contain facts which would support a reasonable inference that the defendants deliberately or recklessly disregarded known adverse facts at the time they made the statements. Steiner v. Unitrode Corp., 834 F. Supp. 40, 43 (D.

---

they were made, I dismiss this portion of the complaint. See Fed. R. Civ. P. 12(b)(6).

The complaint is also based in part on statements by analysts. There is no duty to correct statements by third parties unless the defendant has significantly entangled itself with the third party's production of the statement. Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 - 64 (2d Cir. 1980). As discussed below, the plaintiff failed to plead with sufficient specificity any entanglement between the defendants and Montgomery Securities. Thus, this portion of the complaint is also dismissed. See Fed. R. Civ. P. 9(b).

Mass. 1993); Berliner, 783 F. Supp. at 710, 711 (plaintiff's claim amounted to fraud by hindsight because disclosure seven months after alleged misrepresentation not sufficient to show defendant's knew it was false when made). Absent a showing that the statements were false or misleading at the time they were made, such statements are not actionable under Rule 10b-5.

For the following reasons I find that the plaintiff's allegations that defendants fraudulently misstated current fact cannot meet the particularity requirement of Rule 9. Therefore, I dismiss this portion of the complaint.

1.  Statements of current fact other than revenue statements

Plaintiff claims that certain statements in the January 18th press release ("we are also seeing increased demand for our SDS distributed switch . . . . [T]he SDS distributed switch is becoming the platform of choice . . .. "), the May 3rd press release (Summa Four had received "significant orders" from AT&T, Sprint, GTE, Unysis, and IBM), and a letter accompanying the 1994 Annual Report (Summa Four is in a "strong financial position") misstated current facts. ¶¶ 49-50, 55, 60. Defendants argue that plaintiff has failed to satisfy his Rule 9(b) burden of pleading with particularity the facts which form the basis of his

21

claim that these statements were false when they were made.

The only pleaded facts that even arguably support plaintiff's contention that the cited statements were false when made are allegations in the complaint that Summa Four's own documents establish that (1) the company's revenues, gross margin, and net income during the Class Period were below internal budget projections; (2) March bookings were lower than expected; and (3) the company's internal operations were in a state of disarray. ¶¶ 69-72, 74, 92-98, 121(b). However, these allegations are insufficient to satisfy plaintiff's burden under Rule 9(b) to identify specific facts that make it reasonable to believe that the statements were false. A reasonable person could not infer from the pleaded facts that demand for the SDS switch was no longer growing, that significant orders had not been received from major corporations, or that the company was not in a "strong financial position" simply because it did not meet its short-term budget projections, its orders for one month were lower than expected, and its international operations were in a state of disarray. Accordingly, this portion of the complaint must be dismissed.

2.   Current Revenue Statements

Plaintiff alleges that defendants materially overstated Summa Four's revenues.  Specifically, he contends that Summa Four stated in its public filings that it complied with GAAP and FASB but nevertheless violated these standards by recognizing revenue as soon as an order was placed rather than when goods were shipped.  As a result, plaintiff claims that Summa Four's revenue statements were false and misleading.

The First Circuit recognizes that "a general allegation that the practices at issue resulted in a false report of company earning is not a sufficiently particular claim of misrepresentation to satisfy the requirements of Rule 9(b).  Serabian, 24 F.3d at 362 n.5.  Plaintiff seeks to satisfy this requirement by pointing to the minutes of the June 20, 1994 board meeting (noting that the board's review of a draft revenue recognition policy which was more conservative than the policy then in effect) and the June 14, 1994 board meeting (noting Fiedler's statement that Summa Four might be able to generate up to $4.7 million in revenue in two weeks from "orders" which had not yet been received).  However, these records, simply will not support a reasonable inference that Summa Four was materially overstating its revenues during the period in question.  Thus,

23

this portion of the complaint must be dismissed as well.

**B.   Forward-looking Statements**

1.   Analyst statements

Plaintiff seeks to attribute to the defendants three statements by Montgomery Securities during the Class Period, claiming that these statements regarding anticipated growth and increasing revenues, were false and misleading, and lacking in a reasonable basis. ¶ 121(a).  Further, he alleges that the defendants failed to correct these statements during the Class Period when the statements were or became materially false and misleading.  ¶ 122.  This part of the complaint is attacked by the Defendants on grounds that it lacks the requisite specificity necessary to justify the inference that the Defendants so entangled themselves that the statements may be treated as their own.

In order to base a claim of fraud on statements by third parties, the plaintiff must demonstrate that those statements may be fairly attributed to the defendants.  Raab v. General Physics Corp., 4 F.3d 286, 288 - 89 (4th Cir. 1993).  Where defendants have so entangled themselves "with the analysts' forecasts such that they assumed a duty to disclose the analysts' errors," the statements by analysts may be attributed to the defendant.

24

<u>Colby</u>, 817 F. Supp. at 210. "[S]ince the allegation of entanglement is central to the overall allegation of securities fraud, plaintiffs seeking to hold a corporate insider liable for an analyst's forecasts should plead entanglement with the degree of specificity required under [Rule 9]." <u>In re Caere Corporate Sec. Litig.</u>, 837 F. Supp. 1054, 1059 (N.D. Cal. 1993) (limning three requirements to meet this hurdle). Rule 9(b) imposes the burden on the plaintiffs in this context to allege facts from which it can be inferred that company exercised sufficient control over an analyst such that company may be held liable for the analyst's statements. <u>Raab</u>, 4 F.3d at 288 - 89; <u>Elkind</u>, 635 F.2d at 163 (where company so involves itself in preparation or reports and projections of analysts it may have duty to correct material errors); <u>In re Caere</u>, 837 F. Supp. at 1059 (advocating strict construction of entanglement requirement because analysts make forecasts about publicly traded companies frequently).

Where company officers are directly quoted, other courts have sustained such allegations against Rule 9 challenges. <u>Colby</u>, 817 F. Supp. at 215 n.10 (collecting cases). The analysts cited by the plaintiff here, however, do not directly quote the defendants or make reference to information provided by the defendants. <u>See</u> <u>id.</u> at 213 (analysts' statements not

25

attributable to company where no direct quoting and no reference to misleading information provided by company). All three reports "were presented as independent opinions and [none] referred to any role of [Summa Four] or its officers in the preparation, approval, or editing of the" reports. Id. at 213 - 14; accord Raab, 4 F.3d at 288 (failed to meet Rule 9 specificity requirement where no allegations of who supplied information, how it was supplied or how company controlled contents, especially where report did not directly quote company). The amended complaint only states that some defendants had private communications with representatives from Montgomery Securities and Cruttenden & Company. It does not allege facts which would support a reasonable inference that the statements in question were based on false or misleading information obtained directly from the defendants. While it is unclear whether this circuit would require that the reports quote the defendants in order to impute the former to the latter, because there is no other basis alleged which would establish any, let alone a significant, connection between the defendants and the analysts, I find that the analyst's statements fail to meet the Rule 9(b) requirement. Therefore, claims based on these statements should also be dismissed.

26

2.  Defendants' Statements

Plaintiff cites several statements which he characterizes as forward-looking statements that are actionable under Rule 10b-5 because they lacked a reasonable basis when made.  These statements are found in the May 3rd press release ("We see the current market continuing to expand over the next several years. . . .  We continue to be enthusiastic about our opportunity to grow over the next several years"), Summa Four's 10K Form filed with the SEC ("anticipated growth"), and its letter to shareholders accompanying its Annual Report ("We continue to be enthusiastic about our opportunity to grow"; "Our major goal in Fiscal Year 1995 is to continue to further leverage our market leadership position").  ¶ 54, 59 and 60.

"Although 'predictions are inherently uncertain, they are not exempt from the anti-fraud provisions of the federal securities laws . . . materially misleading predictions made with the scienter are actionable.'"  Rand, 847 F. Supp. at 207 (citations omitted); accord In re Apple Computer, 886 F.2d at 1113.  Because predictions imply a factual basis, they come within the purview of Rule 10b-5's prohibitions.  See Virginia Bankshares v. Sandberg, 111 S. Ct. 2749, 2758 (1991) (statements of belief or opinion are factual statements actionable under

27

securities laws); In re Apple Computer, 886 F.2d at 1113 (listing three factual assertions implied in predictions). Therefore, if a reasonable investor would rely on the predictive statement in making a decision to buy or sell securities, then the prediction, if false or misleading, is actionable. See Basic, 485 U.S. at 248. Statements, however, that are general, vague, or lack specificity, or are not guarantees, even if made without a reasonable basis, are not actionable because a reasonable investor would not rely on them. Capri Optics, 950 F.2d at 10; Rand, 847 F. Supp. at 208; Colby, 817 F. Supp. at 210 - 11 ("prospects for long term growth" not actionable because no projection of earnings or sales statistics and no temporal reference point); Elkind, 635 F.2d at 164 ("we expect another good year in 1972," not actionable). Furthermore, absent a showing of intentional deception, "optimistic predictions about the future that prove to be off the mark likewise are immunized...." Serabian, 24 F.3d at 361; accord Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir.), cert. denied, 113 S. Ct. 365 (1992); Dileo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.), cert. denied, 498 U.S. 941 (1990).

The statements cited by the plaintiff although predictive, lack any specificity as to projected earnings, lack any time frame, and lack any guarantees. Compare Colby, 817 F. Supp. at 210, 211 (statement that "prospects for long term growth are bright" not actionable because vague and no specific projections) with Cosmas v. Hassett, 886 F.2d 8, 12 (2d Cir. 1989) (statement predicting EPS of $.90 to 1.15 for next fiscal year actionable). No reasonable investor would rely on such vague expressions of optimism in deciding whether to purchase Summa Four's securities. Nor could such statements be considered so significant as to alter the total mix of information available to the reasonable investor. Colby, 817 F. Supp. at 211. Thus, these statements fail to meet the materiality requirement necessary to state a claim under Rule 10b-5. Therefore, this portion of the complaint is dismissed. See Fed. R. Civ. P. 12(b)(6).

## C. Omissions

Finally, plaintiff asserts that many of the statements cited, while technically true, were in fact misleading because of defendants' failure to disclose the whole truth. The challenged statements include portions of the January 18th press release (¶ 50), the May 3d press release (¶ 55), and the April 25th announcement of their new product (¶ 52). Plaintiff points to

29

several omitted facts that he claims should have been disclosed in order to cure the misleading nature of the public statements, including: numerous reports during the Class Period indicating that Summa Four was not meeting budget targets; a June 6, 1994 report indicating that two-thirds through the first quarter of 1994 Summa Four had only shipped 50% of what analysts had predicted and even less than its own predictions ¶ 84; a June 14th report indicating that revenue would only be $7.7 million, approximately 30% below projections (¶ 87); and an acknowledgment on June 14th that lower revenues were due to delays in the approval of contracts (¶ 88).

Where the plaintiff alleges that a defendant's silence precipitated the fraud, the complaint must allege that the omitted facts were not only material, but also that the defendant had a duty to disclose those facts. Basic, 485 U.S. at 239 n. 16; Dirks v. SEC, 463 U.S. 646, 657-58 (1983); Backman, 910 F.2d at 12. Nondisclosure in the context of fraud on the market deals with reliance by investors on misleading statements, i.e., misleading because prior disclosures were inaccurate or incomplete. Backman, 910 F.2d at 13; Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987). Thus, where "a corporation does make a disclosure - whether it be voluntary or

30

required - there is a duty to make it complete and accurate." Lucia, 36 F.3d at 175. (internal quotations and citations omitted).

There is no duty, however, that companies make full disclosure of all material information. Backman, 910 F.2d at 12, 16 (duty to disclose does not arise from mere possession of nonpublic information nor from disclosure of one fact about a product) (quoting Chiarella v. United States, 445 U.S. 222, 235 (1980)). "Management cannot be expected to disclose information that some may find distasteful but that does not alter the total mix of information made available to the investor." Roeder, 814 F.2d at 26 (internal quotations and citations omitted); accord Colby, 817 F. Supp. at 213 (duty to disclose does not arise merely because investors may be interested in the information).

Although the "adverse" facts cited by the plaintiff present a picture of a company concerned about its ability to meet its own projections, nothing in these facts indicates that the challenged statements were misleading for failure to include these facts. See Backman, 910 F.2d at 16 (disclosed facts cannot be so incomplete as to mislead). Although the omitted facts might have been important to the reasonable investor, absent a sufficient showing that the disclosed information was so

31

incomplete as to be misleading, defendants were under no duty to disclose this information. Absent something more, this portion of the complaint amounts to nothing more than "fraud by hindsight," not actionable under the securities laws. Thus, this portion of the complaint is dismissed. See Fed. R. Civ. P. 9(b).

## IV. **LEAVE TO AMEND**

At oral argument, Plaintiff requested that in the event that I dismissed his complaint, or portions of it, he be granted leave to amend. Ordinarily leave to amend should be grated liberally. In this case, however, Plaintiff has had the benefit of Defendants' first motion to dismiss as well as limited discovery to prepare the present complaint. Thus, he had "ample opportunity to allege any facts . . . from which liability may flow." Tapogna v. Egan, 141 F.R.D. 370, 373 (D. Mass. 1992). In light of these circumstances, I deny Plaintiff's request for leave to amend.

## V. **OTHER ISSUES**

Because Count I of the complaint is dismissed with prejudice, the Plaintiff cannot assert a claim under 15 U.S.C.A. § 78t(a) (West 1981). Therefore, that claim is also dismissed

32

with prejudice.  Finally, I decline to exercise supplemental jurisdiction over the pendent state law claims.  <u>See</u> 28 U.S.C.A. § 1367(c)(3) (West 1993)  Therefore, these claims are dismissed without prejudice.


## VI.  <u>CONCLUSION</u>

For the foregoing reasons I grant Defendants' Motion to Dismiss (document no. 17).

SO ORDERED.

_____
Paul Barbadoro
United States District Judge


November 8, 1995

cc:  Peter J. MacDonald
     Edward L. Hahn
     Jules Brody
     Lee Shalov
     Joseph H. Weiss

33