W.R. CARNEY, et al., Plaintiffs,

v.

CAMBRIDGE TECHNOLOGY PARTNERS, INC., Arthur M. Toscanini, and James K. Sims, Defendants.

No. Civ.A 99CV10630–RCL.

United States District Court, D. Mass.

March 30, 2001.

Alvin J. Slater, Boston, MA, for plaintiffs.

Neil L. Zola, Adam R. Gonnelli, Wolf Haldenstein Adler Freeman & Herz, New York City, Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Boston, MA, Fred Taylor Isquith, Wolf Haldenstein Adler Freeman & Herz LLP, New York City, for W.R. Carney, Lead Plaintiff, plaintiff.

Thomas V. Urmy, Jr., Shapiro Haber & Urmy LLP, Boston, MA, for Barbara Collins.

Edward F. Haber, Shapiro, Grace & Haber, Boston, MA, for Pengzhe Lu.

Jordan D. Hershman, Christopher F. Robertson, Lori A. Mihalich, Testa, Hurwitz & Thibeault, Boston, MA, for Cambridge Technology Partners, Inc., defendant.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

LINDSAY, District Judge.

*Introduction and Procedural History*

This case has been brought as a class action on behalf of all persons or entities who purchased securities of Cambridge Technology Partners, Inc. ("Cambridge" or "CTP") between November 25, 1998 and March 18, 1999.[1] The three lead plaintiffs are W.R. Carney, James R. Thompson, and Ishiug J. Wu. The essence of the plaintiffs' claim is that the defendants, CTP and two of its officers, issued false or misleading statements during the Class Period in order to inflate artificially the market price of CTP's securities; that the plaintiffs purchased CTP securities at the artificially inflated price prevailing during the Class Period; and that the plaintiffs were damaged when the market price of the securities decreased after the Class Period. The plaintiffs also allege insider trading: specifically, they charge that the two individual defendants profited from the alleged fraudulent scheme by selling their own stock in CTP at the artificially inflated price during the Class Period.

---

1. Although the class has not been certified, for ease of reference, the interim between November 25, 1998 and March 18, 1999 will be referred to in this memorandum and order as the "Class Period." *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 189 n. 3 (1st Cir.1999) (using the term "Class Period," although no class was certified).

The original complaint was filed on March 22, 1999. On June 17, 1999, the court granted the plaintiffs' motion to consolidate a number of related cases, and on August 4, 1999, granted the plaintiffs' motion to appoint the three lead plaintiffs. The plaintiffs thereafter filed a consolidated, amended complaint on October 15, 1999 (the "complaint"), and the defendants followed with a motion to dismiss that complaint.

### Facts Alleged in the Complaint

The following facts are derived from the complaint. On a motion to dismiss, all factual allegations in the complaint are taken as true. *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996).

CTP is a company that "provides information technology and consulting and software development services for companies seeking to shift to direct/server networks from older mainframe computers." Complaint at ¶ 8. CTP also "provides strategic information solutions and consulting services in the Enterprise Resource Planning ("ERP") services market," which includes "enterprise-wide management applications for human resources, finance, and manufacturing." *Id.* at ¶ 25. The defendant James K. Sims ("Sims"), at all times relevant to the complaint, was president, chief executive officer and a director of CTP. The defendant Arthur M. Toscanini ("Toscanini"), at all times relevant to the complaint, was chief financial officer, executive vice president of finance and treasurer of CTP.

On August 31, 1998, CTP acquired Excell Data Corporation ("Excell"). Among other consideration for the acquisition, Excell's shareholders received CTP common stock. On September 3, 1998, CTP told securities analysts that its "revenues were under pressure" and its "prospects going forward were uncertain." *Id.* at ¶ 27. On September 4, 1998, one securities analyst,

Mark D'Annolfo, of the firm Adams, Harkness, Inc., downgraded his recommendation for CTP's stock from "buy" to "attractive," and Toscanini confirmed with analysts generally that CTP would be lowering its revenue projections for the second half of 1998 and for 1999. *Id.* at ¶¶ 28–29. By the end of that day, the value of CTP stock had declined by 22%.

On October 14, 1998, CTP announced that its results for the third quarter of 1998 (the quarter that had ended September 30, 1998) were lower than had been projected on September 4. The value of CTP's stock then declined an additional 22%. On November 16, 1998, another securities analyst, Kani Klinstead of the firm of Lehman Brothers, Inc., downgraded his recommendation for CTP from "buy" to "neutral," stating, "there is a fundamental risk of further earnings costs here." *Id.* at ¶ 31. On November 19, 1999, the former Excell shareholders brought suit against CTP before another judge in this federal district. *See Pacheco v. Cambridge Technology Partners (Massachusetts), Inc.,* 85 F.Supp.2d 69 (D.Mass.2000)) (the "*Pacheco Litigation* ". The plaintiffs in the *Pacheco Litigation* asserted violations of the securities laws.

During the Class Period, eight allegedly false or misleading statements were made. These statements include: one newspaper article quoting Sims; one securities analyst report quoting Sims; three securities analysts' reports not quoting Sims or any other CTP officer; two CTP press releases; and representations made at a securities analysts' conference. According to the plaintiffs, these statements were made in reaction to the *Pacheco Litigation* and as part of a "concerted scheme to stem the slide of [CTP's] common stock and misdirect the market's analysis of [its] problems by misrepresenting that the problems arose from internal 'organizational mis-

steps' and were not driven by the 'economic environment' or [CTP's] weakening fundamentals." *Complaint* at ¶ 34. In the plaintiffs' view,

the truth was that [CTP] was unsuccessfully implementing its purported reorganizational program, failing to accrue meaningful benefits from the process, and defendants knew that the putative reorganization was a failure. [CTP], in actuality, was experiencing consistently slower sales growth throughout the Class Period and a decrease in demand for ERP software license, all of which defendants knew reflected the failure of their reorganization effort and would cause Cambridge to fall woefully short of its earnings estimates.

*Id.* at ¶ 36. Each of the eight statements will be discussed in detail below.

During the Class Period, Sims sold 125,000 of the approximately 2 .3 million shares of CTP common stock he owned and earned profits exceeding $3.8 million; Toscanini also sold "substantial amounts" of the common stock he owned in CTP—approximately 75,000 shares—and realized "substantial profits"—approximately $2.4 million—during the Class Period. *Id.* at ¶¶ 9–10, 81. Although the lead plaintiffs are alleged to have purchased CTP common stock during the Class Period, the complaint is silent as to the dates and amounts of the stock purchases made either by them or by the remaining plaintiffs.

After the market closed on March 18, 1999, the ending date of the Class Period, CTP issued a press release in *Business Wire* indicating that the preliminary results for its first quarter (ending March 31, 1999) would be "well below analysts' estimates." The press release stated:

**2.** I understand the adjectives used to describe the defendants' statements, reorganization ef-

[CTP] reported that the benefits of the North American reorganization initiatives undertaken during the fourth quarter of 1998 did not materialize as quickly as anticipated and, as a result, sales growth for the first quarter was lower than expected. In addition, a decrease in market demand for ERP software licenses negatively affected demand for the Company's ERS package implementation offerings.

*Id.* at ¶ 51.

Following this release, the price of CTP stock fell by "more than 40%," and the price "has not meaningfully recovered." *Id.* at ¶ 53. Securities analysts "immediately downgraded" CTP, "citing the Company's misleading information concerning its purported reorganization, highly suspicious pre-release and insider sales, and seemingly unjustified positive statements and earnings guidance during the February analysts' meeting." *Id.* at ¶ 54.[2]

### *Discussion*

#### I. *The Plaintiffs' Claims.*

The plaintiffs allege violations of sections 10(b), 20(a) and 20(A) of the Securities Exchange Act (the "Exchange Act") and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated by the Securities and Exchange Commission. Section 10(b), 15 U.S.C. § 78j(b), makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Rule 10b–5 is an implementing regulation under Section 10(b). Section 20(a), 15 U.S.C.

forts, and sales to be the words of the plaintiffs, not those of "securities analysts."

§ 78t(a), concerns liability for "controlling persons." It states: "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Section 20(A) of the Exchange Act, 15 U.S.C. § 78t–1, is also known as the Insider Trading and Securities Fraud Enforcement Act ("ITSFEA"). It provides, in relevant part: "Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent ·jurisdiction to any person who, contemporaneously with the purchase of securities that is the subject of such violation ... purchased securities of the same class."

Count I alleges that, during the Class Period, the defendants carried out a plan to "(i) deceive the investing public, including plaintiffs ...; (ii) artificially inflate and maintain the market price of the company's common stock; and (iii) cause plaintiffs ... to purchase or otherwise acquire the Company's common stock at artificially inflated prices." *Id.* at ¶ 65. Specifically, Count I alleges that the defendants made "materially false and misleading statements about the Company's financial condition and operations" and concealed "adverse material information" about CTP. *Id.* at ¶ 66.

Count II alleges that the individual defendants, Sims and Toscanini, acted as controlling persons of CTP "by virtue of their high-level positions in the company."

*Id.* at ¶ 76. The complaint states: "the individual defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is [sic] presumed to have the power to control or influence the particular transactions giving rise to the securities violations as alleged herein." *Id.*

Count III alleges that Sims and Toscanini sold shares in CTP "while in the possession of material adverse non-public information" in violation of Section 20A. *Id.* at ¶¶ 81–2.

## II. *The Relevant Pleading Standards.*

### A. *Claims under Section 10(b) and Rule 10b–5.*

The plaintiffs' claims are subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The enactment of the PSLRA was "a bipartisan effort to curb abuse in private securities lawsuits, particularly the filing of strike suits." *Greebel,* 194 F.3d at 191. "Strike suits" are " 'shareholder derivative actions begun with the hope of winning large attorney fees or private settlements.' " *Id.* at n. 5, (quoting BLACK'S LAW DICTIONARY 1423 (6th ed.1990)). The PSLRA sets out the pleading requirements for filing securities fraud actions as follows:

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the cir-

cumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1)–(2). The First Circuit's recent decision in *Greebel* made a number of observations regarding the pleading standards under the PSLRA:

1. The PSLRA imposes requirements for pleading with particularity that are consistent with this circuit's prior rigorous requirements for pleading fraud with particularity under Fed.R.Civ.P. 9(b).

2. The PSLRA mandates neither the adoption nor the rejection of particular patterns of evidence to prove fraud and scienter, and thus does not alter this circuit's prior law on these points.

3. The PSLRA does, significantly, impose a requirement that pleadings raise a "strong" inference of scienter rather than a merely "reasonable" inference of scienter.

4. The PSLRA does not alter the previous definition of scienter, one that

in this circuit includes a narrowly defined concept of recklessness which does not include ordinary negligence, but is closer to being a lesser form of intent.

194 F.3d at 188.

As the *Greebel* decision made plain, then, "the PSLRA's pleading standard is congruent and consistent with the preexisting [Rule 9(b)] standards of this circuit," a circuit which "has been notably strict and rigorous in applying the Rule 9(b) standard in securities fraud actions." *Id.* at 193. As for the reasons for the traditionally strict and rigorous pleading standards, the First Circuit stated in *Suna v. Bailey Corporation*, "[w]e have repeatedly emphasized Rule 9(b)'s heightened pleading requirements because of our concern that plaintiffs will bring baseless strike suits against securities defendants in order to increase settlement amounts or to engage in a fishing expedition for evidence on which to base their claims." 107 F.3d 64, 73 (1st Cir.1997). *See also, Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir.1998); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1223 (1st Cir.1996); *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991). *Greebel* reiterated the relevant First Circuit standards for pleading the false or misleading element of a securities fraud claim under Rule 9(b):

First, this court had already required a fraud plaintiff to specify each allegedly misleading statement or omission.... Second, this court has required a securities fraud plaintiff to explain why the challenged statement or omission is misleading by requiring that "the complaint ... provide some factual support for the allegations of fraud." (citation omitted) This means that the plaintiff must not only allege the time, place, and content of the alleged misrepresentations with

specificity, but also the "factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants." (citation omitted) Finally, this court has required plaintiffs who bring their claims on information and belief to "set forth the source of the information and the reasons for the belief." (citations omitted)

194 F.3d at 193–94.

In addition to the foregoing, a plaintiff, in a securities fraud action, must also plead materiality. Misrepresentations are actionable only if the misstated or omitted fact was "material," that is, "only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.' " *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

However, "a corporation does not commit securities fraud merely by failing to disclose all nonpublic material in its possession. The corporation must first have a duty to disclose the nonpublic material information." *Id.* (citing *Roeder v. Alpha Indus. Inc.*, 814 F.2d 22, 26 (1st Cir.1987)). "[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *In re Boston Technology, Inc. Securities Litigation*, 8 F.Supp.2d 43, 53 (D.Mass.1998). Although there is a duty to make a corporate disclosure "complete and accurate," this "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so

that what was revealed would not be 'so incomplete as to mislead.' " *Gross,* 93 F.3d at 992 (quoting *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990)). A claim "based on omissions and erroneous forecasts (rather than direct misstatements), ... must offer factual indications that [the defendants'] omissions violated a duty to make further disclosure, or that [the defendants'] forecasts were not reasonably based or were not made in good faith." *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 210 (D.Mass.1993) (citing *Backman,* 910 F.2d at 12–13; *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1450 (D.Mass.1989)).

*Greebel* also discussed the PSLRA's scienter requirement, emphasizing that "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." 194 F.3d at 195–96. Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In *Greebel,* the First Circuit refused to categorize particular patterns of facts as per se "acceptable or unacceptable to prove scienter or prove fraud," and reaffirmed its case-by-case approach, underscoring that the critical issue is whether the facts are sufficient to raise a *strong* inference of scienter. 194 F.3d at 196.

Specifically, the court noted that, as to "motive and opportunity" pleading, "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are [not] sufficient." *Id.* at 197 (quoting *In re Advanta Corp. Securities Litigation,* 180 F.3d 525, 535 (3d Cir. 1999)). In addition, with respect to allegations of insider trading, the *Greebel* court "caution[ed] that mere pleading of insider trading, without regard to either context or the strength of the inferences to be

drawn, is not enough.... At a minimum, the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants." *Id.* at 198.

The court in *Greebel* also articulated its view that "recklessness," as narrowly defined by the Seventh Circuit, may be offered as proof of scienter. That definition is as follows:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.

*Id.* at 198 (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977), *cert. denied* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977)).

**B.** *Claims under Sections 20(a) and 20(A).*

To state a claim under both Section 20(a) and Section 20A, the plaintiffs first must adequately plead a predicate violation of the Exchange Act or its rules and regulations. *See Greebel,* 194 F.3d at 207; *Advanta Corp.,* 180 F.3d at 541.

**III.** *Application of the Pleading Standards to the Present Section 10(b) Claims.*

The plaintiffs argue that in determining whether the plaintiffs have adequately pleaded securities fraud, all the challenged statements should be considered together and in context. In this circuit, however, securities fraud cases are "decided by a statement-by-statement analysis in which the inquiry made is re-stricted to the immediate context of each statement—namely, the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made." *Boston Technology,* 8 F.Supp.2d at 55. *See also, In re Peritus Software Services, Inc. Securities Litigation,* 52 F.Supp.2d 211, 219 n. 1 (D.Mass.1999). Accordingly, a full discussion of each statement follows.

**A.** *The Wall Street Journal Article: November 25, 1998.*

On November 25, 1998, the *Wall Street Journal* published an article that discussed CTP and quoted Sims. The article stated:

> James Sims, Cambridge's chief executive, acknowledges that the company faces tighter computer-consulting budgets at major corporations next year. But he says the third-quarter stumble reflects the company's *own organizational missteps more than the economic environment.*
>
> The Company had a decentralized approach, with managers in 53 offices worldwide making their own decisions. Far flung executives were slow to spot changes in information spending, so Cambridge lost business to smaller companies and Big Five accounting firms, Mr. Sims says. Now he says the company is restructuring to focus more on service lines. He says that will help Cambridge shift quickly to win accounts in the fastest growing markets, including Internet and data-storage projects. So, he is confident that earnings can grow at 30% a year. And he is surprised at how Wall Street turned on his company.
>
> "It's unbelievable," he says. "With the stock at $57, everyone was calling it a 'strong buy.' Now, at $18 or $19, they're downgrading the stock. *The only thing I can say about analysts is*

*that they're always wrong. Listen to them and you'll never make money. Now is the time to make money on Cambridge stock."*

Complaint at ¶ 37 (emphasis in complaint).

1. *The complaint does not explain why the statements in the November 25, 1998, Wall Street Journal Article are misleading.*

█ The plaintiffs are required to provide some factual support for their allegations of fraud; that is, that they must point to facts that would support the inference that the defendants knew of and deliberately or recklessly disregarded adverse circumstances that existed at the time the statements were made. *Greebel,* 194 F.3d at 193–94 (citations omitted). The complaint does not provide any such facts.

None of the reasons given in the complaint (¶¶ 48–50, reproduced in section III.E below) as to why the defendants' statements generally were misleading relates to the *Wall Street Journal* article of November 25, 1998. Paragraph 48 relates specifically to statements Sims made on February 4, 1999. Paragraphs 49 and 50 explain that the defendants' statements were false or misleading in light of knowledge that the defendants allegedly acquired *"through* the Class Period." (emphasis added). Thus, by their terms, these two paragraphs do not relate to statements in the *Wall Street Journal* article, which was published on the first day of the Class Period.

The only reason given by the plaintiffs that relates specifically to the question of why statements made in the *Wall Street Journal* article were false or misleading is that the statements caused the price of CTP's stock to rise because the market reacted to "Sims' recommendations that investors ignore securities analysts' evaluation of Cambridge, which [Sims'] statement plainly contended were [sic] incorrect," and the market "belie[ved] that defendant Sims had a superior knowledge of Cambridge, and its prospects." Complaint at ¶ 38. This purported reason, however, does not satisfy the pleading standards of the PSLRA and Rule 9(b).

First, and most important, there is no indication that the statements made by Sims were false or misleading at the time that he made them. The plaintiffs have alleged no facts indicating that undisclosed, adverse circumstances belying Sims' statements existed on November 25, 1998 much less that Sims knew of and deliberately or recklessly disregarded such circumstances when he made the statements. Sims' statements to the *Wall Street Journal* were made during the fourth quarter of 1998. He indicated his belief that the company would recover from its "third quarter stumble." And indeed, as the complaint itself recognizes, CTP's fourth quarter and fiscal year 1998 results were in line with analysts' estimates. The February 4, 1999 press release (discussed below in section III.E) states that CTP's revenue in 1998 represented a 40% increase over its revenue in 1997.[3] Thus, the facts alleged in the com-

---

**3.** While the plaintiffs omitted this portion of the press release from the complaint, the defendants included a full copy of the press release in the appendix to their motion to dismiss. Neither the inclusion of this exhibit nor my consideration of it transforms the present motion into one for summary judgment. "[A] court may properly consider the relevant entirety of a document integral or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw,* 82 F.3d at 1220. *See also Colby,* 817 F.Supp. at 209 n. 6 (citing *Fudge v. Penthouse Intern., Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988)).

plaint actually undermine the drawing of any inference that adverse circumstances existed on November 25, 1998.

Second, courts in the First Circuit generally have declined to impose liability for so-called "forward looking statements"— that is, broad statements that express optimism about a company's future—because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor. "[E]xaggerated, vague, or loosely optimistic statements are not actionable.... The rule covers loose optimism about both an issuer's current state of affairs and its future prospects." *Boston Technology,* 8 F.Supp.2d at 54. *See also Colby,* 817 F.Supp. at 211 ("There is good reason for the courts to discourage complaints based on allegedly misleading generalized forecasts. Such forecasts are inherently difficult and unreliable, though necessary, and are not likely to be 'material' to investors"). Indeed, the PSLRA itself creates a "safe harbor" for forward looking statements. As described in *Greebel,* the PSLRA's safe harbor "has two alternative inlets: the first shelters forward-looking statements that are accompanied by meaningful cautionary statements[;] ... [and the second] precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge it was false or misleading." 194 F.3d at 201; *see* 15 U.S.C. § 78u–5.

In this instance, the idea that reasonable investors would ignore the advice and cautions of independent securities analysts based solely on the optimistic opinions of Sims, the company's president, is at odds with common sense. In their consideration of whether broad, optimistic statements about a company's future can be a predicate for liability under the securities laws, courts have recognized that corporate executives often make vague, opti-

mistic statements about their firms' outlook. Thus courts generally have declined to impose liability for such statements. *See Shaw,* 82 F.3d at 1217 ("courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available"). Sims' expression of confidence in his company and his exhortation to ignore the advice of securities analysts are typical of the kind of "self directed corporate puffery" and sales talk that courts in this circuit have shielded from liability. *Shaw,* 82 F.3d at 1218. As the court stated in *Colby,* "[a] reasonably well informed investor could not reasonably have considered [the defendant's] bare ... comment to be so significant as to alter the mix of information bearing on investment. The 'forecast' is not material as a matter of law." 817 F.Supp. at 211.

As to Sims' prediction of 30% growth, although one court in this district has stated that optimistic projections "accompanied by specific qualifications of projected results implying certainty" can be the basis of liability, *id.,* in this case, the issue is moot. That is because Sims' prediction in fact was not off the mark. As noted above, the complaint acknowledges that CTP in 1998 enjoyed a 40% increase in earnings over 1997.

Sims' remaining statements—his description of CTP's restructuring plan and his expressed confidence about the plan's effect on CTP's future earnings—are nonactionable forward-looking statements. Perhaps "[h]ad [the plaintiffs] presented facts known by [the defendants], and con-

temporaneous with the statements above, that would show that [the defendant's] anticipated success was unlikely, such facts would have adequately alleged a claim of securities fraud." *Suna*, 107 F.3d at 70. Here, however, the plaintiffs have alleged no such facts.

Moreover, there is no basis in the complaint to support an allegation that Sims' statement on November 25, 1998 omitted any material fact. In the first sentence of the article, Sims reportedly "acknowledges that the company faces tighter computer-consulting budgets at major corporations next year." This acknowledgment put Sims' other, more optimistic statements in a tempering context for potential investors. Furthermore, the complaint does not "offer factual indications" that Sims "violated a duty to make further disclosure," or that his "forecasts were not reasonably based or were not made in good faith." *Colby*, 817 F.Supp. at 210.

2. *The allegations regarding the November 25, 1998, Wall Street Journal article are brought upon information and belief, but the complaint does not set forth the source of the plaintiffs' information and the reasons for their belief.*

■■ The complaint states at the outset that the plaintiffs' allegations primarily are "based upon the investigation of their counsel."[4] By so pleading, the plaintiffs apparently seek to avoid the particularity requirement for allegations made on "information and belief." *Lirette v. Shiva Corp., ("Lirette I")*, however, suggests that, under the PSLRA, basing allegations on the investigation of counsel may not be "an acceptable approach to pleading." 999 F.Supp. 164, 165 (D.Mass.1998). Citing

*Lirette I*, another recent opinion emanating from this district has held that "[p]leading based on investigation by counsel is similar to pleading on information and belief; the complaint must specify the facts upon which the information is based." *Ormer v. Aspen Technology, Inc.*, slip op., Civ. Action No. 98–12018–RWZ (D.Mass. October 31, 2000) (Zobel, J.), at 4 (citing *In re Silicon Graphics, Inc. Securities Litigation*, 970 F.Supp. 746, 763 (N.D.Cal.1997) (pleadings based on investigation of counsel are the same as those based on information and belief)).

The cited decisions, in my view, faithfully implement one of the purposes of the PSLRA, namely to ensure that "investors . . .—not their lawyers—exercise primary control over private securities litigation." *In Re Galileo Corp. Shareholders Litigation*, 127 F.Supp.2d 251, 260 (D.Mass.2001) (quoting S.Rep. No. 104–98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683). Congress, in considering proposals that led to the enactment of the PSLRA, specifically found that, in the environment preceding the enactment of the PSLRA, "the initiative for filing 10b–5 suits [came] entirely from the lawyers, not from genuine investors," and that "investors usually [had] great difficulty exercising meaningful direction over the case brought on their behalf." S.Rep. No. 104–98, at 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685. Indeed, Congress found that "[t]he lawyers [could] decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients." *Id.* With these specific concerns in mind and generally despairing at what was perceived as the role of some lawyers in manufacturing and controlling abusive securities litigation, *see*, H.R.Conf.

---

**4.** All of the plaintiffs' claims, based as they are on "investigation of their counsel," are subject to the analysis that follows.

Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730–748, Congress hardly could have intended that the requirement that an allegation made on information and belief be accompanied by a particularized statement of all facts that form the basis of the belief, could be evaded by the mere recital that the allegations are based on the "investigation of counsel." It appears then, from the legislative history of the PSLRA, that a securities fraud action brought on the basis of an "investigation of counsel"—with its implications of lawyer-directed and motivated litigation—was precisely the kind of case Congress found most troubling. *See* S.Rep. No. 104–98, at 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685. Given this history and the provisions of the PSLRA overall, the plaintiffs here (and plaintiffs in securities fraud cases generally) cannot escape the conclusion that Congress intended that allegations of fraud based on "investigation of counsel" be considered the equivalent of allegations made on information and belief, and that the pleader therefore be required to state with particularity all facts that form the basis for the belief that fraud has occurred.

In the case of the November 25, 1998 *Wall Street Journal* article, the allegation that the defendants were engaged in fraud, as uncovered through the investigation of the plaintiffs' counsel, is insufficient because the complaint does not set forth with particularity the basis on which the plaintiffs formed a belief that the statements in the article were false or misleading. The plaintiffs advert to an investigation of their counsel that included "(i) an analysis of publicly-available news articles and reports; (ii) review and analysis of public filings including, but not limit-

ed, to the corporate defendants' annual and fiscal quarterly reports; (iii) press releases issued by defendants; and (v)[sic] other matters of public record." With the possible exception of the CTP's annual and fiscal quarterly reports, the plaintiffs do not identify with specificity the material reviewed and analyzed by their counsel. And even as to the annual and quarterly fiscal reports, the plaintiffs fail to state which reports were examined. Furthermore, as to all the sources of information alleged to have been the subject of inquiry by the plaintiffs' counsel, the plaintiffs fail to set out with particularity what information counsel discovered in their inquiry, where that information was discovered, and how the information led to the belief that the defendants had engaged in fraudulent conduct. Laden with these deficiencies, the allegations concerning the statements made in the November 25, 1998 *Wall Street Journal* article do not meet the particularity requirement of the PSLRA and Rule 9(b) for allegations made on information and belief.[5]

B. *The Tucker Anthony & R.L. Day, Inc. Research Report: November 30, 1998.*

On November 30, 1998, the financial services company, Tucker Anthony & R.L. Day, Inc., issued a research report on CTP ("the Tucker Anthony report"). The Tucker Anthony report stated that: (1) CTP's common stock should trade above $25; (2) while CTP was not growing as quickly as it had in the past, the slower growth was already incorporated into the stock price; (3) CTP's internal reorganization would be successful and would exceed management's goal of 34% annual financial growth once the reorganization began to

---

**5.** As noted in the preceding footnote, the same problem exists for each of the other statements alleged by the plaintiffs to be false or misleading. The pervasiveness of the problem is enough itself to justify the granting of defendants' motion to dismiss.

yield results; and (4) CTP would meet fourth quarter 1998 and first quarter 1999 earnings estimates and exceed subsequent quarterly forecasts. *See* Complaint at ¶ 39.

It does not appear from the Tucker Anthony report that the defendants themselves wrote or issued the report; nor does the Tucker Anthony report quote any of the defendants. Furthermore, the complaint does not allege specifically that the defendants provided any of the information contained in the Tucker Anthony report or how and when they provided information.[6] Under these circumstances, the allegations regarding the Tucker Anthony report cannot but fail to meet the pleading requirements of the PSLRA and Rule 9(b). *See Suna*, 107 F.3d at 74 (allegations failed to meet heightened pleading requirements when challenged forecasts of analyst did not quote defendants and did not imply that defendants supplied or confirmed the information on which the forecasts were based). *See also In re Segue Software*, 106 F.Supp.2d. at 168 n. 12 ("absent some showing of willful manipulation of the analysts by [the defendants] management, these statements cannot be attributed to the defendants"); *Colby*, 817 F.Supp. at 213–214 (defendants were not liable where analysts' report was "presented as [an] independent opinion . . . and [did not] re-

fer . . . to any role of [the defendants] in the preparation, approval, or editing of the . . . data presented").[7]

### C. The Mark D'Annolfo Recommendation: January 25, 1999.

On January 25, 1999, securities analyst Mark D'Annolfo raised his rating of CTP's stock to "strong buy." The complaint alleges that this event was an example of "[CPT's] efforts to resuscitate its common stock through influencing securities industry analysts." Complaint at ¶ 41.

It does not appear from the complaint that the defendants made or issued the Mark D'Annolfo recommendation. Nor is there any specific allegation that the defendants provided D'Annolfo with information on which he based his recommendation. Thus the allegations of fraud relating to the January 25, 1999 D'Annolfo recommendation, like those relating to the Tucker Anthony report, fail to meet the pleading requirements of the PSLRA and Rule 9(b).

### D. The BancBoston Robertson Stephens, Inc. Statement: February 3, 1999.

On February 3, 1999, BancBoston Robertson Stephens, Inc. ("BancBoston") also issued a "buy" rating for CTP. *Id.* at 42.

---

**6.** The complaint alleges that the Tucker Anthony report was "premised" on the November 25, 1998 *Wall Street Journal* article. *See* Complaint at ¶ 39. The plaintiffs, however, do not say how they arrived at the conclusion that the Tucker Anthony report was so premised.

**7.** The First Circuit has not yet ruled definitively on whether it is possible for a company to be held liable for statements about its stock made by outside analysts. The court has made clear, however, that in order to raise such an issue, a complaint must sufficiently plead "entanglement," between the company or its officers and the issuance of the report.

*Suna*, 107 F.3d at 73–74. *See, e.g., Peritus*, 52 F.Supp.2d at 230 (allegations that analysts "met" and "engaged in conversation with [company's] senior management" "fail by a wide margin to clear the Rule 9(b) standard of particularity, specifying neither the time, place nor content of the speakers's communication to the analysts"); *Boston Technology*, 8 F.Supp.2d at 58 (plaintiffs must "specify the time, place, speaker, and content of what was said to the [analyst] firms by the defendants that would have induced them to make the allegedly misleading comments and forecasts"). In this case, the plaintiffs utterly have failed to plead such an entanglement.

The complaint suggests that this was another example of CTP's influencing securities industry analysts. *Id.* at 41.

As with the Tucker Anthony report and the January 25, 1999 Mark D'Annolfo recommendation, the complaint does not allege that the defendants made or issued the BancBoston statement. Neither does it allege a specific communication between the defendants and the authors of the statement in which the defendants provided the information on which the statement was based. Thus again, the allegations fall short of the requirements of the PSLRA and Rule 9(b).

E. *The CTP Press Release (Business Wire): February 4, 1999.*

■ On February 4, 1999, CTP reported its results for the fourth quarter of 1998, the quarter ending on December 31. CTP also issued a press release in *Business Wire* that stated:

James K. Sims, President and CEO commented on Cambridge's performance. "Cambridge provided solid revenue and earnings growth for the full year 1998." During 1998, Cambridge served over 700 global clients across all of our service lines. Our top ten clients represented approximately 20% of 1998 revenues. Further, in 1998, our International and North American revenues continue to grow rapidly, increasing 48% and 36%, respectively. At year-end, approximately 50% of our projects worldwide contained an Internet or interactive component. In addition, we announced major alliances with key partners during the year, including: Cisco Systems, BroadVision, and Microsoft. In addition, we expanded our existing partnership with Sun Microsystems. These alliances continue to support our fixed-time/fixed-price rapid methodologies as well as serve as an additional business development channel.

\*    \*    \*    \*    \*    \*

Mr. Sims continued, "International revenues represented 34% of total revenues in the fourth quarter, with 41% growth over 1997. North American revenues represented 66% of total revenues in the fourth quarter with 17% growth over 1997. Additionally, 49% of our total engagements worldwide were derived from existing clients."

During the fourth quarter, Cambridge began the process of reorganizing its North American Business Unit from a geographic model to a national service lines model. This reorganization was initiated to better serve Cambridge's clients by providing integrated best-in-class service offerings. Also during the quarter, Cambridge's proposal [sic] activity for potential engagements across all service lines, representing advancements in the new business development engine. In particular, in North America, the proposal activity increased over the third quarter adding an number of new Fortune 1000 companies to the client roster ranging from the telecommunications, utility, home entertainment, financial services, insurance and pharmaceutical industries.

\*    \*    \*    \*    \*    \*

1999 Outlook

In the first half of 1999, Cambridge reported it will invest in the service line infrastructure to support the Company's next level of growth. Investments in sales and technical training, the new managing partner (client relationships) and alliance organizations, field marketing, and project delivery methodologies will be made.

Mr. Sims concluded, "Our outlook for 1999 remains upbeat. Growth in the full

year of 1999 will be driven by client demand in three key areas: information technology strategy, architecture and infrastructure for solving complex business challenges; effective management of operational change; and the creation of competitive advantages through electronic commerce solutions.

"Demand for these solutions will be delivered globally through our high-growth service lines including, but not limited to: Cambridge Management Consulting (change/process management); Customer Management Solutions (sales force automation; call center; Web-enablement); Interactive Solutions (business to business/business to consumer); and Enterprise Resource Solutions (Web-enablement of packaged applications; supply chain management; e-procurement and middle market applications)."

Complaint at ¶ 43.

The complaint alleges the following as reasons the statements were false or misleading:

48. Defendants [sic] statements, employed to bolster and regenerate its stock price, were false and misleading for the following reasons. First, Sims' statements of February 4, 1999, were false because the Company was continuing to experience slow demand for its products, especially its ERP software and the Company's highly touted reorganization was not remedying the fundamental problems with the Company's business. Specifically, though defendants blamed the Company's problems on "missteps," they were the product of significant contract deferrals, cancellations, and pipeline/distribution issues that did not comport with Mr. Sims' prior statements that there had been an increase in the number of contracts the Company was bidding on or that were "in the works."

49. Second, defendants knew that the decline in business was the result of a continuing decrease in demand for ERP software licenses through the Class Period and defendants knew this could not be resolved by "reorganizing" management and correcting "missteps." These problems reflected a fundamental decline in demand for the Company's products and services and could not be solved via a "reorganization."

50. Finally, the highly touted reorganization was not progressing as defendants had planned, nor resulting in the positive results defendants led the market to believe would flow from the reorganization and, consequently, defendants knew, or should have known but for their reckless disregard of the facts known to them throughout the Class Period, that the Company would experience reduced revenues and earnings for the first quarter of 1999, regardless of Statements to the contrary.

Complaint at ¶¶ 48–50.

As noted above, the plaintiffs are required to provide factual support for their claim that the challenged statements are false or misleading, including factual support for the inference that the defendants knew of and disregarded adverse circumstances existing at the time the statements or omissions were made. *See Greebel,* 194 F.3d at 193–97. The complaint here again, however, fails to provide that support.

First, much of the press release in question merely reports historical information about the 1998 fiscal year, particularly the fourth quarter of 1998. The plaintiffs do

not allege that this historical information is inaccurate. In any event, the accurate reporting of historical information cannot be the basis for a securities fraud claim. *See, e.g., Boston Technology,* 8 F.Supp.2d at 61 ("the announcement of earnings for the preceding quarter is no basis for . . . liability"). Moreover, "[t]he fact that a company has reported accurately about past successes does not by itself burden the company with a duty to inform the market that the present circumstances are less positive." *Gross,* 93 F.3d at 992 (citing *Shaw,* 82 F.3d at 1202); *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (no duty of further disclosure "even if present circumstances are less rosy"). As the court explained in *Boston Technology,* "the rationale behind the rule is . . . tied to the concept of materiality—it would be unreasonable for someone to take a report strictly concerned with the past as a representation about the future, and therefore such a report is per se immaterial to the investment decision." 8 F.Supp.2d at 54.

Second, as to the portion of the press release entitled "1999 Outlook," Sims' statements are not actionable. His statement that "[o]ur outlook for 1999 remains upbeat" is a forward-looking and vague expression of optimism. *See Colby,* 817 F.Supp. at 211 (company's comment that "long term prospects are bright" not material as a matter of law). Moreover, as the defendants point out, the February 4, 1999 press release includes a full paragraph entitled "Forward Looking Statements," which specifically warns potential investors that the company's projections are "subject to risks and uncertainties." This detailed cautionary language, which the plaintiffs did not include in the complaint, "shield[s] [the defendants] from liability . . . by way of the 'bespeaks caution' doctrine," because it is "sufficiently strong in both tone and substance to counter whatever significance investors might reasonably attach to the prediction." *Boston Technology,* 8 F.Supp.2d at 60–61. It also effectively places the forward-looking statements in the press release within the PSLRA's safe harbor.

Third, the plaintiffs have alleged no specific facts indicating that undisclosed adverse circumstances existed on February 4, 1999, which were known and deliberately or recklessly disregarded by CTP and Sims when Sims made the statements in the February 4, 1999 press release. The plaintiffs merely state broadly that CTP's business was declining because of slow demand for its products and services. No specific facts are alleged to show that, at the time of the February 4, 1999 press release, there was, in fact, a decline in CTP's business due to decreased demand for CTP's products and services. Furthermore, the plaintiffs do not allege facts sufficient to support an inference that CTP and Sims were aware of any demand-related decline in CTP's business. To satisfy the requirement of showing that a defendant making a statement challenged as false or misleading, successful plaintiffs "typically identify internal reports, memoranda or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time." *Id.* at 57. The plaintiffs here have provided no such information; nor have they alleged other specific facts indicating "a contrast between what company officials were hearing internally . . . and what the company was telling the public at the same time." *Serabian,* 24 F.3d at 365. In fact, the complaint here shows that the February 4, 1999 press release states that "[g]rowth in the full year of 1999 will be driven by client demand"—an obvious reminder to investors that growth was de-

mand-dependent and not assured.[8]

Instead, the plaintiffs essentially have stated no more than that the defendants "must have known" that CTP's business was declining, because viewed in hindsight, that business in fact was declining. The First Circuit has "consistently held that a securities plaintiff does not satisfy the requirements of Rule 9(b) [and thus now the requirements of the PSLRA] merely by pleading 'fraud by hindsight.'" *Gross*, 93 F.3d at 991 (quoting *Greenstone v. Cambex Corporation*, 975 F.2d 22, 25 (1st Cir.1992). "[T]here is no liability where a plaintiff's claim rests on the assumption that defendants 'must have known of the severity of their problems earlier because conditions became so bad later on.'" *Boston Technology*, 8 F.Supp.2d at 53 (citing *Serabian*, 24 F.3d at 367). *See also, Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.Supp.2d. 12, 20 (D.Mass.2000) (plaintiffs "cannot merely speculate in hindsight that because [defendant] ran into a sales slowdown and reduced revenue by the end of the Class Period" that earlier statements "of good corporate health ... must have been inaccurate"); *Colby*, 817 F.Supp. at 215 ("[D]efendants' ... alleged 'materially adverse' knowledge of [the corporate defendant's] decline in September is largely inferred from their November acknowledgment of 'continued' declining sales. That sort of inferred omission by hindsight admission is rejected herein as a basis for a duty to disclose").

The plaintiff's allegations about the February 4, 1999 press release, although cast as allegations about fraud, are actually allegations about poor management. There is no liability for securities fraud, however, if what is complained of is poor management. "Only fraud, not poor management or even gross mismanagement is actionable under the securities laws." *Colby*, 817 F.Supp. at 212 (quoting *Boyle v. Merrimack Bancorp, Inc.*, 756 F.Supp. 55, 58 (D.Mass.1991)). *See Serabian*, 24 F.3d at 361 (securities laws "do not guarantee sound business practices and do not protect investors against reverses"), *Fitzer*, 119 F.Supp.2d at 31 ("poor management is a risk that every investor takes[,] ... [and][d]amages flowing therefrom are not actionable under the securities laws").

F. *The Dow Jones Report: February 4, 1999.*

█ A February 4, 1999, Dow Jones report quoted and attributed statements to Sims as follows:

"We've been through a very complex year," Sims told Dow Jones in an interview. *Last year was a transition year for the company*, he noted, but the company's new focus is "dead on right," he said. *"The structure we put together is going to allow us to be competitive in the marketplace,"* he said.

Sims said he is comfortable with analysts' 1999 consensus estimate of $1.12 a share and 1999 revenue growth of 30%. In 1998, the company reported earnings of 92 cents a share on 40% revenue growth to $612 million.

Complaint at ¶ 44. (emphasis in complaint) The Dow Jones report included additional information:

defendant was alleged to have known of mounting losses from a particular product and published a report noting increased product costs, but did not quantify the scale of the defendant's losses or its declining production. *Colby*, 817 F.Supp. at 213 (citing *Backman*, 910 F.2d at 16–17).

---

**8.** The plaintiffs' failure to allege specific facts supporting the allegation that CTP's business was declining because of decreasing demand for its products and services, includes their failure to provide any quantification of CTP's alleged business demand. A similar failure in another securities fraud case resulted in the complaint being "dead on arrival," where the

During its fourth quarter, Cambridge Technology changed its operating structure to one that was service-line focused as opposed to its former geographic-region emphasis. The changes affect the company's North American business unit.

*The new framework provides better coordination for Cambridge Technology's salespeople to sell services on a national basis, according to a company spokeswoman.*

During its fourth quarter, Cambridge's North American business unit represented 66% of the $160.2 million total and increased 17% over 1997. The company's international unit, or the balance, boosted its revenue to 41% growth.

This year, Cambridge Technology Chief Executive Sims said he expects that international revenue will continue to grow faster than domestic revenue since it's a lower base.

*The company is comfortable with analysts' estimates of 30% revenue growth this year, Sims said. "My guidance is for steady improvement," he said.*

*Over the past three months, there's been a pickup in the amount of services contracts that the company is bidding on or has in the works, Sims said.*

Furthermore, customers' spending plans for computer services in general seem to be roughly at the same growth rate as last year. The question is one of emphasizing areas where spending is expected to increase, Sims said.

Cambridge Technology is accentuating higher growth services such as electronic commerce, sales force automation, supply-chain management, and enhancing customers' software to take advantage of the Internet.

Complaint at ¶ 45. (emphasis in the complaint)

Presumably, paragraphs 48–50 of the complaint, set forth earlier in this memorandum and order, form the entire basis for the plaintiffs' allegation that the February 4, 1999 Dow Jones report was false or misleading. I therefore review the Dow Jones report in the context of those allegations.

As an initial matter, some of what is in the Dow Jones report concerns historical information about the fourth quarter of 1998. The plaintiffs do not allege that this historical information is inaccurate. As noted earlier, an accurate report of historical information cannot be the basis for a securities fraud claim. *See e.g., Boston Technology*, 8 F.Supp.2d at 54, 61.

Second, the remaining statements in the report are immaterial corporate puffery or forward-looking statements. Sims' statements that the "company's new focus is 'dead on right,'" and that CTP will be "competitive in the marketplace," are similar to statements found not to be actionable in other cases in this circuit. *See, e.g., Shaw*, 82 F.3d at 1219 (holding immaterial as a matter of law defendant's statements that the company "should show progress quarter over quarter, year over year;" that it was "basically on track;" and that he was "confident that [the company] was pursuing the right strategy"); *Peritus*, 52 F.Supp.2d at 220 ("[c]iting an 'unprecedented market demand' for [the company's] offerings was simply part and parcel of the standard corporate hyperbole that accompanies any new product or service announcement"). Likewise, courts routinely have declined to impose liability where company officers simply express their "comfort" with analysts' estimates. *See, e.g., Colby*, 817 F.Supp. at 212–13.

Third, as discussed earlier, the plaintiffs have presented no specific facts indicating that undisclosed adverse circumstances existed on February 4, 1999, or that CTP

and Sim knew of and deliberately disregarded those adverse circumstances when Sims made his statements.

### · G. *The Securities Analyst Conference: Mid–February, 1999.*

■ According to the complaint, "[i]n mid-February, defendants held a securities analyst conference ... at which defendants reiterated their previously expressed guidance for first quarter 1999 revenues of between $163 million and $170 million and earnings of between $.21 and $.24 per share." Complaint at ¶ 46.

The complaint does not allege the time, place or content of each alleged misrepresentation concerning the conference; nor does the complaint identify which of the defendants made allegedly fraudulent statements. For these reasons, the complaint as to the securities analyst conference fails. *See, e.g., Boston Technology,* 8 F.Supp.2d at 58 (allegation that defendants repeatedly assured analysts that the company was "on track to .achieve ... strong earnings and earnings growth," without more, insufficient under Rule 9(b)); *Colby,* 817 F.Supp. at 215 ("There are only vague claims of misleading company 'guidance' which is entirely unspecified as to 'time, place, or content' of the acts of the individual defendants in leading the analysts astray. Such gossamer allegations cannot bear the weight of the scrutiny necessary under Fed.R.Civ.P. 9(b)").

### H. *Scienter*

Because I have determined that all of the statements claimed by the plaintiffs to constitute misrepresentations fail for lack of the specificity required by the PSLRA and Rule 9(b), it is not necessary that I discuss the plaintiffs' allegations concerning scienter. As noted in the conclusion to this memorandum and order, however, I am dismissing the complaint with prejudice. That decision was informed, in part, by my analysis of the plaintiffs' allegations concerning scienter. It is appropriate, therefore, that I set out that analysis here.

As noted in Part II of the discussion section of this memorandum and order, the PSLRA requires that a plaintiff in a securities fraud action state with particularity the facts that give rise to a strong inference that, in making statements alleged to be false or misleading, a defendant acted with intent to deceive, manipulate or defraud or, at the least, acted recklessly. *See Greebel,* 194 F.3d at 195–198. The plaintiffs make several assertions which they say give rise to the strong inference of scienter required by the PSLRA and Rule 9(b). Complaint at ¶¶ 58–62. Plaintiffs allege that:

1. the individual defendants, Sims and Toscanini, by virtue of their senior positions with CTP, knew or should have known the operating and financial circumstances of CTP and its prospects for the future when the challenged statements were made;

2. Sims and Toscanini made substantial sales of their personal stock in CTP during the Class Period; and

3. all of the defendants were motivated to issue false or misleading statements to increase the company stock in light of the pendency of the *Pacheco Litigation.*

I will discuss, in turn, each of these assertions regarding scienter. My analysis of the assertions applies with equal force to all of the statements alleged by the plaintiffs to have been false or misleading.

■ First, the plaintiffs allege broadly

that Sims and Toscanini,[9] "[b]y virtue of [their] senior positions with the Company, . . . knew or should have known, but for [their] reckless disregard of the truth" that the company's true financial operating and financial picture was at odds with public statements made by the defendants or by others outside of CTP. Complaint at ¶¶ 9–10. The plaintiffs allege that, because of their positions with CTP, Sim and Toscanini

> had access to adverse, undisclosed information about [CTP's] business operations, business practices, finances, present and future business prospects *via* internal corporate documents, including the company's operating plans, budgets and forecasts and reports of actual operations compared thereto, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them.

Complaint at ¶ 12.

Thus the allegation is of knowledge derived by Sims and Toscanini from unspecified plans, budgets, forecasts, reports, conversations, connections, meetings and "other" information to which these defendants had access because of their positions with CTP. No strong inference of scienter can arise from allegations about sources of information, like those alleged here, that are so vague and general as to invite questions as to the extent to which these sources exist at all. The allegations presuppose a certain corporate regularity and an efficient internal reporting system, working effectively so as fully to inform the defendants of CTP's financial and op-

erating circumstances at times relevant to the issuance of the statements in question. Nothing is said specifically in the complaint about how well CTP's corporate machinery actually worked, about the internal flow of information, or about what reports were generated, when they were generated and what the reports contained. Nothing is said about who at CTP talked to whom, when those talks occurred or what was said. Nothing is said about who met with whom, when those meetings occurred and what happened at those meetings. This kind of pleading, attributing knowledge to a defendant merely because of the defendant's status in a corporation, generally fails as a method of meeting the rigorous requirements for pleading scienter. "Attempts to plead scienter by general allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss." *Lirette v. Shiva Corporation,* 27 F.Supp.2d 268, 283 (D.Mass.1998) ("*Lirette II*; *Shaw,* 82 F.3d at 1224 n. 38 ("[A]bsent some indication of the specific factual content of any single report generated . . . [allegations of a highly-efficient reporting system] do not independently provide a factual basis for inferring [the defendants'] knowledge." *See also, Boston Technology,* 8 F.Supp.2d at 58 (pleadings insufficient where "[n]ot a single report, memorandum, meeting minute, or like item is referred to or specified in the Complaint") If the allegations here create any inference at all, they create the kind of inference which courts "on numerous occasions [have] determined to be inadequate 'to withstand the special pleading requirements in securities fraud cases.'" *Lirette II,* 27 F.Supp.2d at 283 (quoting *Maldonado,* 137 F.3d at 9). *See also, Serabian,* 24 F.3d at 361 ("[G]eneral aver-

---

**9.** The complaint makes no claim that any statement at issue was made directly by Toscanini. However, the complaint imputes knowledge to Toscanini by virtue of his posi-

tion as CTP's chief financial officer. In light of my disposition of this case, it is not necessary that I address the appropriateness of the claims against Toscanini individually.

ments of the defendants' knowledge of material falsity will not suffice.").

▮ The plaintiffs also allege that a strong inference of scienter arises from the fact that both Sims and Toscanini sold shares of stock during February, 1999. But as the court said in *Greebel*, to show scienter on the basis of stock trading, the plaintiffs must show that the defendants' trading was "unusual, well beyond the normal patterns of trading by those defendants." 194 F.3d at 198. Here, the plaintiffs allege that Sims sold 125,000 shares, valued at approximately $3.85 million dollars. Toscanini is alleged to have sold 85,004 shares valued at approximately $2.6 million dollars. Nothing, however, is said about whether these sales were inconsistent with any pattern established by these defendants in either amount or to timing. Without more, these allegations do not raise a strong inference of scienter. *See, e.g., Peritus*, 52 F.Supp.2d at 224 ("In this case, the Class has alleged only that insider trading occurred, not that it was unusual or suspicious"); *Boston Technology*, 8 F.Supp.2d at 58 ("Plaintiffs have not asserted any facts as to amount normally traded from which it would be reasonable to infer that the defendants' actions were out of the ordinary").

▮ Finally, the plaintiffs claim that the defendants made false or misleading statements to increase the price of CTP's stock in order to weaken the damages claim in the *Pacheco Litigation*. This allegation, together with the allegations that the defendants were suitably placed to know about and make false or misleading statements concerning CTP's present and future financial and operating circumstances because of their positions with CTP, amount to an allegation that scienter may be inferred from the motive of the individual defendants to influence the *Pacheco Litigation* and their opportunity to do so with authoritative statements about CTP's financial and operating conditions. There may be circumstances in which the pleading of motive and opportunity suffices to create a strong inference of scienter, but "[m]erely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough." *Galileo Corp.*, 127 F.Supp.2d at 270 (quoting *Greebel*, 194 F.3d at 197). No facts are offered to support the claim that the defendants were motivated to make false or misleading statements by their desire to influence the *Pacheco Litigation*, except that the statements followed the announcement of the filing of the *Pacheco Litigation*, and the statements were made as part of a scheme to "stem the slide" of CTP's common stock that occurred in the wake of that announcement. These allegations, standing alone as they do, evoke the logical fallacy, captured in the familiar Latin phrase: *post hoc ergo propter hoc* — the assertion of a cause and effect relationship between two events merely because one event follows the other in time. The absence of allegations of specific facts connecting the *Pacheco Litigation* to the challenged statements case makes of the logical fallacy a pleading fallacy as well. It is difficult enough to say that a *reasonable* inference can be drawn, from the facts alleged, that the defendants' statements were motivated by a desire of the defendants to influence the *Pacheco Litigation;* it is impossible to say that a *strong* inference of that kind can be drawn.

For the foregoing reasons, I rule that none of the allegations of scienter are sufficient to meet the pleading requirements of the PSLRA and Rule 9(b).

## IV. *Application of the Standards to the Sections 20(a) and 20A Claims.*

▮ Because the plaintiffs have not adequately pleaded a predicate violation of the Securities Exchange Act of 1934, they do not state a claim under either Section 20(a) or Section 20A.

### A. *Section 20(a).*

"Section 20(a) of the Exchange Act ... provides for derivative liability of persons who 'control' others found to be primarily liable under the Exchange Act.... Because plaintiffs' complaint does not adequately allege an underlying violation of the securities laws," dismissal of the Section 20(a) claim is appropriate. *Greebel,* 194 F.3d at 207 (citing *Suna,* 107 F.3d at 72). *See also, Boston Technology,* 8 F.Supp.2d at 72; *Segue Software,* 106 F.Supp.2d at 172.

### B. *Section 20A.*

To state a claim for insider trading, the plaintiffs must have adequately alleged a violation of the Exchange Act. *See, e.g., Advanta Corp.,* 180 F.3d at 541–42 ("claims under section 20(A) are derivative, requiring proof of a separate underlying violation of the Exchange Act"); *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2d Cir.1994) ("[T]o state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations"); *Colby,* 817 F.Supp. at 215 (insider trading claim deficient: plaintiff "has not sufficiently alleged what 'materially adverse information' any defendant possessed during the 'class period' and hence there can be no duty to avoid trading or to make disclosure to equalize knowledge of insiders and the investing public").[10] Because the plaintiffs have not stated a claim under Section 10(b), their Section 20A claim also fails.

### Conclusion

For the reasons stated above, defendants' motion to dismiss is GRANTED.

The plaintiffs' request for leave to amend their complaint further, contained in a footnote in their memorandum in opposition to the motion to dismiss, is denied. Here, as in *Colby,* the plaintiffs have "pled [their] case with determined imagination, but little factual substance. Considerations of fairness, judicial economy, and congressional purpose in enacting the Securities Laws all point to a denial of discovery and to dismissal of this complaint with prejudice." 817 F.Supp. at 217. The clerk shall enter a judgment dismissing this action and the related, consolidated cases.

So ordered.

---

10. The plaintiffs' claim also fails for an independent reason: the complaint does not allege when the lead plaintiffs' stock purchases were made. To state a claim under Section 20A, insider trading must be "contemporaneous" with a plaintiff's own trading. Case law in this circuit holds that an interval of just two days between a plaintiff's purchase and sales by insiders is sufficient to deny the plaintiff standing as a contemporaneous trader. *See Backman v. Polaroid Corp.,* 540 F.Supp. 667, 671 (D.Mass.1982), *aff'd* 910 F.2d 10 (1st Cir.1990).